**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**UNITED STATES OF AMERICA**

**v.**                                                              **Criminal No. 2:08-00286**

**ARACOMA COAL COMPANY**

**ARACOMA COAL COMPANY'S**
**SENTENCING MEMORANDUM**

Defendant Aracoma Coal Company ("Aracoma") is before the Court for sentencing, having entered a guilty plea to one violation of 30 U.S.C. § 820(d), misdemeanor violation of mandatory safety standards, resulting in death; eight violations of 30 U.S.C. § 820(d), misdemeanor violations of mandatory safety standards, not resulting in death; and one violation of 30 U.S.C. § 820(f), a felony false statement violation.  The charges arose from a January 2006 underground mine fire that tragically took the lives of two Aracoma miners.  As explained more fully below, the sentence recommended in the Plea Agreement is appropriate in this matter, particularly because Aracoma responded immediately and effectively to the misconduct for which it now takes full responsibility, implementing additional training and safety measures that have made Aracoma's mines among the very safest in the nation.  In pleading guilty, Aracoma is both accepting responsibility for the lapses that led to this tragedy and demonstrating its commitment to taking all necessary measures to ensure that it never occurs again.

## BACKGROUND

Aracoma operates an underground coal mine in Logan County, West Virginia, known as the "Alma No. 1" mine.  *See* Presentence Investigation Report ("PSIR") ¶¶ 9, 12; *see also* Ex. 1 (Plea Agreement's Stipulation of Facts ("Agreed Facts")) ¶ 1.  On January 19, 2006, Aracoma miners Ellery Hatfield and Don Bragg died in an underground fire at Alma No. 1.  Though this tragedy exposed significant failures to fulfill safety and ethics standards set by Massey Energy and by federal and state regulators, Aracoma has responded with an extraordinary commitment to redress those failures and to protect its personnel.  Indeed, in the years following the fire, Aracoma has established an exemplary safety record that has brought recognition from regulatory agencies and others for outstanding industry-leading safety performance.

According to data published by the Mine Safety and Health Administration ("MSHA"), Aracoma's two mines – Alma No. 1 and Hernshaw – have had only two fatal accidents in their more than nine years of operation, including the fatal mine fire from which this case arises.  *See* PSIR ¶ 58; *see also* Ex. 2 (MSHA Mine Overview for Alma No. 1); Ex. 3 (MSHA Mine Overview for Hernshaw).  The other fatality, a May 16, 2008 accident at the Alma No. 1 mine, occurred when an electrician cut into an energized phase lead cable without determining whether it was de-energized and without locking out or tagging the power source.  *See* PSIR ¶ 58; *see also* Ex. 4 (WVMHS&T Investigation Report); Ex. 5 (MSHA Fatalgram).  Though MSHA has not yet released its final mine accident report, the West Virginia Office of Miners' Health, Safety and Training ("WVMHS&T") concluded that the accident resulted from the electrician's own failure to lock out or tag the power source.  *Id.*

Aracoma's Alma No. 1 and Hernshaw mines consistently attain a Non-Fatal Days Lost ("NFDL") incidence rate far lower than the national NFDL incidence rate for mines of the same

2

type.  *See* Ex. 2 (MSHA Mine Overview for Alma No. 1); Ex. 3 (MSHA Mine Overview for Hernshaw); Ex. 6 (Graph Comparing Aracoma's NFDL rates against national rate).  Those rates have dropped even lower in the years since the fire, placing Aracoma near the top of the industry for lowest lost-time accident rates.  In fact, in 2007, the two mines achieved an extraordinary 0.00 NFDL incidence rate, despite a combined 571,071 operator hours worked and 1,217,637 tons of coal produced.  *Id.*

Both before and after the fire, Aracoma had in place an innovative and award-winning safety and ethics program.  That program is comprised primarily of the renowned Massey S-1 program and its rigorous safety requirements, but also is enhanced by a safety incentive program, exhaustive training programs, and binding employee Safety Commitment Agreements and Ethics Commitment Agreements.  *See* PSIR ¶¶ 61-63; *see also* Ex. 7 (Overview of S-1 safety compliance and ethics program); Ex. 8 (Member Handbook) at 1-3, 6-12; Ex. 9 (Raymond Safety Program Press Release); Ex. 10 (Safety Pledge); Ex. 11 (Ethics Commitment Agreement); Ex. 12 (Corporate Social Responsibility Report) at 4-11.

Despite those extensive compliance measures, post-fire investigation revealed that conditions at Alma No. 1 were undeniably inadequate and unsafe.  Essential safety structures were compromised, examinations failed to identify deficiencies, critical fire and evacuation drills were not performed and were recorded untruthfully in required records, and responsible personnel were not adequately prepared to implement an immediate mine evacuation when emergency conditions threatened miners underground.  These conditions exacerbated the potential dangers of a mine fire, and thus sadly contributed to the deaths of miners Hatfield and Bragg when fire broke out on January 19, 2006.

Aracoma makes no excuses for these transgressions, accepts full responsibility for failing to recognize and rectify dangerous conditions immediately, and is uniformly remorseful for the avoidable loss of two cherished members.  It is, however, also resolute in its determination to learn from its mistakes and to emerge as an industry leader in safety commitment and achievement.  As detailed below, in the months and years following the tragic fire at Alma, Aracoma has installed state of the art fire suppression systems, has developed and implemented enhanced firefighting measures and technologies, has provided innovative training and technologies for emergency mine evacuation and mine rescue, and has made numerous other changes designed to ensure the safety of its people.  These dramatic improvements have shown tangible results, as Aracoma's mines now rank among the very safest mines in the nation – including achieving the remarkable 0.00 NFDL incidence rate in 2007.

Indeed, honoring its exceptional accomplishments, on May 9, 2008, the Joseph A. Holmes Safety Association ("Holmes Association") presented Aracoma's Alma and Hernshaw mines with prestigious national Pacesetter Awards for outstanding safety achievement.  *See* PSIR ¶ 64; *see also* Ex. 13 (Holmes Association Press Release).  The Holmes Association is comprised of representatives from state and federal government agencies, including MSHA, and from mining organizations and labor unions, and its Pacesetter Awards are coveted in the mining industry for recognizing the industry's outstanding safety performance.  In addition to its Pacesetter Awards, Aracoma also earned Massey Energy Company's 2007 Bradbury Safety Award, an annual award recognizing Massey's safest mining operation.  *See* PSIR ¶ 64; *see also* Ex. 14 (Bradbury Award Press Release); Ex. 12 (Corporate Social Responsibility Report) at 9. These prestigious safety awards are a tremendous source of pride to Aracoma, both its

management and its members,[1] and are a testament to its renewed commitment and dedication to prioritizing safety above all else.

### Events Preceding the January 19, 2006 Fire: Separation of the Primary Escapeway and Conduct of Escapeway Drills

Aracoma originally provided a primary escapeway from the No. 2 working section at the Alma No. 1 mine that complied with the requirements of 30 C.F.R. § 75.380, including the requirement that it be separated from belt haulage entries for its entire length by permanent stoppings or other permanent ventilation control devices.  During the final week of October 2005, however, Aracoma construction employees removed a permanent ventilation stopping located in the No. 7 belt entry to facilitate installation of a dual switch house, a piece of electrical equipment more commonly known as a splitter box.  *See* PSIR ¶ 23; *see also* Ex. 1 (Agreed Facts) ¶ 6.  Removal of that stopping compromised complete separation of the No. 2 working section's primary escapeway from the belt haulage entry for the No. 9 longwall conveyor belt, a condition that unfortunately went uncorrected.  *Id.* ¶¶ 8-9.

Similarly, during the final week of November 2005, Aracoma electricians removed a different permanent ventilation stopping located between SS 3266 and the travel roadway in the crosscut where the electrical installations for the 9 Headgate longwall belt drive and takeup storage unit were located.  *Id.* ¶ 7.  The electricians removed this stopping to reduce accumulation of heat in that crosscut by ventilating it.  *Id.*  Removal of this stopping further compromised separation between the primary escapeway and the belt entry, and also went uncorrected by Aracoma employees.  *Id.* ¶¶ 8-9.

---

[1] Aracoma refers to its employees as "members," a designation that fosters a strong sense of investment and personal responsibility from its most senior management down the line to entry-level hourly employees.

The Government and Aracoma agree that Aracoma's practice escapeway drills for the period from October 6, 2005 through December 7, 2005, the six-week period immediately preceding January 19, 2006, and the ninety-day period immediately preceding January 19, 2006 were inadequate and did not comply with all applicable federal regulatory requirements, including those set forth in 30 C.F.R. § 75.383.  *See* PSIR ¶¶ 24, 36-41; *see also* Ex. 1 (Agreed Facts)  ¶¶ 21-26.   During those periods, no practice escapeway drill meeting all such requirements was conducted by the miners on either the No. 2 or the No. 9 longwall working sections.  *Id.*

On January 7, 2006, an Aracoma foreman from the No. 2 working section of the Alma No. 1 mine, entered false statements and certifications in Aracoma's Escapeway and Fire Drill Record Book.  *Id.* ¶ 27.  Specifically, that foreman included entries in the book that indicated certain miners had participated in specified practice escapeway drills on that particular date.  *Id.* The Government and Aracoma agree that the foreman knew no such escapeway drills had been conducted by those listed miners on that date, and therefore agree the entries in the record book were knowingly false.  *Id.*   Though Aracoma accepts responsibility for the actions of its employee, the Government did not charge that Aracoma's mine management participated in, or had knowledge of, false entries in the Fire Drill Record Book.  Moreover, the Government agrees that no evidence suggests Massey Energy knew, approved, or acquiesced in the failure to maintain those records truthfully and accurately.  *Id.* ¶ 28.

**The January 19, 2006 Fatal Mine Fire**

In the late afternoon of January 19, 2006, a fire ignited at the take-up storage unit on the No. 9 longwall conveyor belt line at the Alma No. 1 mine.  Both the Government and Aracoma agree on the essential facts related to the January 19, 2006 fire.  *See* PSIR ¶¶ 14-22; *see also* Ex. 1 (Agreed Facts).  At the time the fire broke out, miners – including Ellery Hatfield and Don

Bragg – were working at the No. 2 working section of the mine. *See* PSIR ¶ 14; *see also* Ex. 1 (Agreed Facts) ¶ 11.

When it became apparent that the Aracoma employees who responded immediately to the fire were unable to extinguish it, and thus apparent that the fire presented an imminent danger to the miners working on the No. 2 section and the longwall section, responsible persons at the mine were slow to conduct an immediate evacuation of those mine workers. *See* PSIR ¶¶ 17-18; *see also* Ex. 1 (Agreed Facts) ¶ 16. Aracoma and the Government agree that the dispatcher employee responsible for operating the mine's atmospheric monitoring system that evening was not trained adequately on emergency mine evacuation procedures. *Id. See* PSIR ¶ 29; *see also* Ex. 1 (Agreed Facts) ¶ 18.

When instructed to evacuate the mine because of the fire, Mr. Hatfield, Mr. Bragg, and the other ten members of the No. 2 section crew boarded their mantrip and began to drive out of the mine on their normal travel route. *See* PSIR ¶ 19; *see also* Ex. 1 (Agreed Facts) ¶ 12. Upon turning a corner, the twelve miners aboard the mantrip were engulfed in smoke and, because of its thickness, were unable to see in what became virtually zero visibility. *See* Ex. 1 (Agreed Facts) ¶ 13. Smoke was present in the primary escapeway because of the missing permanent ventilation stoppings. *Id.* ¶ 10. Successfully donning their self-contained self-rescuers (SCSRs), which provide emergency oxygen, ten of the twelve miners on that mantrip located the nearest personnel door and escaped into the secondary escapeway, which was free from smoke. *See* PSIR ¶ 20; *see also* Ex. 1 (Agreed Facts) ¶ 14. Mr. Hatfield and Mr. Bragg became separated from the other members of their crew, were unable to escape through the same personnel door, and ultimately perished from suffocation. *Id.*

**Aracoma's Emergency Response, Investigation Cooperation,
and Subsequent Remedial and Preventive Measures**

Upon learning of the fire, Aracoma's management promptly notified the East Kentucky Massey Energy mine rescue team and appropriate authorities, including both WVMHS&T and MSHA. *See* PSIR ¶ 55. Ultimately, a total of twenty-six mine rescue teams were assembled to assist in rescue and recovery operations at Alma No. 1. *Id.* ¶ 22. The fire eventually was controlled and extinguished, and Mr. Hatfield and Mr. Bragg's bodies were recovered on January 21, 2006. *Id.*

In the weeks and months following the fire, separate investigations were conducted by WVMHS&T, MSHA, and the U.S. Attorney's Office for the Southern District of West Virginia. In the Plea Agreement, the Government agreed that Aracoma has cooperated with the U.S. Attorney's Office during the grand jury investigation of this matter and during plea negotiations, by producing documents, providing factual information, and sharing legal research. *See* PSIR ¶¶ 54-55; *see also* Ex. 15 (Plea Agreement, dated 12/17/08) ¶ 8. Aracoma also has cooperated by paying full restitution to Mr. Hatfield and Mr. Bragg's families, fines totaling $2,500,000, civil penalties totaling $1,700,000, and all required special assessments. *Id.*

Committed to preventing any similar tragedy from recurring, Aracoma has implemented significant remedial and preventive measures following the fire, including many identified by MSHA at the conclusion of its investigation. *See* PSIR ¶¶ 59-60. For instance, Aracoma retrained its dispatchers and atmospheric monitoring system operators, including the dispatcher on duty at the time of the fire, such that its dispatchers are now adequately trained in Aracoma's safe haulage procedures related to the ventilation systems, firefighting procedures, and emergency evacuation procedures. *Id.* Aracoma also has installed state of the art sprinkler fire-suppression systems to extinguish fires immediately, systems that far exceed the requirements of

applicable state and federal regulations.  *Id.*; *see also* Ex. 16 (Fire Prevention and Response Measures).  It has installed new firehoses with permanent water connection and improved access, provided thermal imaging devices and associated training to its mine rescue teams, developed a mobile firefighting trailer loaded with specialized firefighting equipment, produced a mobile smoke room training unit to train miners for difficult mine fire evacuations, and implemented enhanced quality assurance testing of all SCSR devices.  *Id.*; *see also* Ex. 16 (Fire Prevention and Response Measures); Ex. 17 (New Safety Initiatives Press Release).  In 2007, Massey Energy also unveiled a new self-contained foam fire-fighting mine car, an innovative piece of underground firefighting equipment developed in response to the Alma No. 1 tragedy.  *See* Ex. 18 (Massey Safety Innovations); Ex. 12 (Corporate Social Responsibility Report) at 11.  All Aracoma belt examiners have been retrained and instructed to check all ventilation stoppings during examinations and to accurately reflect all ventilation controls on mine maps, and all Aracoma members have been retrained extensively on the requirements of the mine's Emergency Evacuation and Fire Fighting Plan, including conducting frequent and compliant emergency evacuation escapeway drills.  *See* PSIR ¶ 60; *see also* Ex. 19 (Excerpt from WVMHS&T Fatal Investigation Report).

### The Government and Aracoma Agree on the Essential Facts Relevant to the Offenses and to Sentencing

This matter is notable in the degree to which the Government and Aracoma agree on the essential facts relevant to both the offenses and sentencing.  Unlike the typical case in which a defendant and the Government dispute relevant details, both sides brought greater clarity to the underlying record by jointly arriving at a Stipulation of Facts.  *See* PSIR ¶ 4; *see also* Ex. 1 (Agreed Facts).  As you can see from that document, Aracoma has accepted responsibility for its agents' actions and has stipulated to the essential facts of the misconduct occurring between

October 2005 and January 19, 2006.  *Id.* ¶¶ 6-9, 16, 18, 21-27.  Further, as reflected in the comprehensive Presentence Investigation Report, and the absence of unresolved objections to that Report, the parties here also agree on the critical facts relevant to sentencing.

**Admission of Guilt**

In this matter Aracoma has clearly recognized and affirmatively accepted responsibility for the actions of its agents.  *See* PSIR ¶ 55; *see also* Ex. 1 (Agreed Facts).  On January 14, 2009 in the Southern District of West Virginia, Aracoma pled guilty to nine misdemeanor violations of mandatory safety standards and one felony false statement violation.  *See* PSIR ¶ 6; *see also* Ex. 20 (Guilty Plea, dated 1/14/09); Ex. 15 (Plea Agreement).  Aracoma entered its guilty plea in cooperation with the U.S. Attorney's Office and consented to the filing of the Information, waiving its right under Rule 7 of the Federal Rules of Criminal Procedure to be charged by indictment.  *Id.* (Plea Agreement) ¶ 1.

## DISCUSSION

When considered under the applicable sentencing statute and related Sentencing Guidelines, the underlying record in this case demonstrates that the sentence recommended in the Plea Agreement is appropriate and warranted.

## I.    CALCULATION OF AN APPROPRIATE SENTENCE

As mentioned above, Aracoma pled guilty to one violation of 30 U.S.C. § 820(d), misdemeanor violations of mandatory safety standards, resulting in death; eight violations of 30 U.S.C. § 820(d), misdemeanor violations of mandatory safety standards, not resulting in death; and one violation of 30 U.S.C. § 820(f), a felony false statement violation.  The Court, therefore, must determine an appropriate sentence comprised of a fine, restitution order, and term of probation.

### A.      Fine Calculation

For the nine 30 U.S.C. § 820(d) misdemeanor violations, the statute in effect as of the date of the fire provides that such violations are punishable "by a fine of not more than $25,000, or by imprisonment for not more than one year, or by both."  30 U.S.C. § 820(d).[2]  Those nine offenses thus qualify as Class A misdemeanors.  18 U.S.C. § 3559(a)(6).  Consequently, the alternative sentencing provisions of 18 U.S.C. § 3571 apply and, in turn, provide that for each of the eight Class A misdemeanors that did not result in death, Aracoma may be fined "not more than $200,000." 18 U.S.C. § 3571(c)(5).  For the single misdemeanor violation resulting in death, charged in Count One of the Information, Aracoma may be fined "not more than $500,000."  18 U.S.C. § 3571(c)(4).  Finally, for the single felony false statement violation (Count Ten of the Information), Aracoma may be fined "not more than $500,000."  18 U.S.C. § 3571(c)(3).  Accordingly, as Aracoma and the Government agreed in the Plea Agreement, the total maximum penalty to which Aracoma will be exposed by virtue of its guilty pleas includes "fines totaling $2.6 million."[3]  *See* PSIR ¶ 66, 69; *see also* Ex. 15 (Plea Agreement) ¶ 3d.

The Government has agreed here that, "[p]ursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States and Aracoma agree that a specific sentence is the appropriate disposition of this case, namely, that $2.5 million is the appropriate fine."  *Id.* ¶ 6.

---

[2] Though the statute since has been amended to provide for a fine of not more than $250,000, the federal *Ex Post Facto* Clause, found at Article I, § 9, clause 3 of the United States Constitution, "flatly prohibits retroactive application of penal legislation."  *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994).  *See also United States v. Davenport*, 445 F.3d 366, 369 (4th Cir. 2006) ("a law violates the Ex Post Facto Clause when it is retrospective – *i.e.*, when it applies to events predating its enactment – and it disadvantages those to whom it applies.").

[3] The Plea Agreement also recognizes that, pursuant to 18 U.S.C. § 3571(d), Aracoma alternatively may be fined at twice the gross pecuniary gain or loss resulting from the offenses.  *See* Ex. 15 (Plea Agreement) ¶ 3d.  However, the Government has not alleged that the charged offenses have resulted in any pecuniary gain or loss, and instead specifically has agreed "that $2.5 million is the appropriate fine" in this case.  *Id.* ¶ 6.

As shown below, the relevant sentencing criteria establish that the agreed $2.5 million fine is more than adequate and should be approved by the Court.

The particular offenses charged here are outside the scope of the United States Sentencing Commission's fine guidelines.  *See* PSIR ¶ 71; *see also* Ex. 15 (Plea Agreement) ¶ 10.  The determination of whether the agreed $2.5 million fine is indeed the appropriate fine in this matter, therefore, must be made by applying the provisions of 18 U.S.C. §§ 3553 and 3572. *See* United States Sentencing Commission, Guidelines Manual, §§ 8C2.1; 8C2.10 (Nov. 2008) ("USSG") ("For any count or counts not covered under § 8C2.1 (Applicability of Fine Guidelines), the court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572.").

In determining the imposition of a sentence under 18 U.S.C. § 3553, the Court considers the following general criteria: (1) the nature and circumstances of the offense along with the history and characteristics of the defendant; (2) the need for a sentence that promotes respect for law, provides a just punishment, deters criminal conduct and protects the public; (3) the kinds of available sentences; (4) the applicable range in the sentencing guidelines; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted disparities among similarly situated defendants; and (7) the need to provide restitution to any victims.  18 U.S.C. § 3553(a).  These overlapping factors essentially direct the Court to consider Aracoma's history as a company, the circumstances surrounding the charged violations, and whether the federal guidelines suggest an outcome different than what would otherwise be reached.   As demonstrated below, these considerations all support a conclusion that the Plea Agreement's recommended sentence is appropriate and warranted in this case.

### 1.    The History and Characteristics of Aracoma and the Nature and Circumstances of the Offense.

Aracoma's general history and characteristics demonstrate that the agreed $2.5 million fine is appropriate.  The mine consistently has operated safely and has established a safety record generally superior to mines of its type in the United States.  *See* Ex. 2 (MSHA Mine Overview for Alma No. 1); Ex. 3 (MSHA Mine Overview for Hernshaw); Ex. 6 (Graph Comparing Aracoma's NFDL rates against national rate).  The company has no prior criminal record, and in the years since the fire has been awarded multiple prestigious national awards for outstanding safety achievement.  *See* PSIR ¶ 64; *see also* Ex. 13 (Holmes Association Press Release); Ex. 14 (Bradbury Award Press Release); Ex. 12 (Corporate Social Responsibility Report) at 9.  This safety record is a direct result of the emphasis that Aracoma places on its culture of "Safety is Job 1" and on comprehensive employee training, and the truly exemplary record of the last several years reflects the renewed commitment to those principles that Aracoma and its members have made following the fire.  Aracoma also has a comprehensive and effective ethics program, securing employees' pledge to abide by the law, to not take "unsafe shortcuts," and to never falsify records.  *See* PSIR ¶ 61; *see also* Ex. 10 (Safety Pledge) at 2; Ex. 11 (Ethics Commitment Agreement), ¶ 5.

The nature and circumstances of these offenses also support entry of the recommended sentence.  The Government has not charged that any Aracoma managers or supervisors directed, participated in, or knew of the charged misconduct.  Moreover, the Alma No. 1 mine previously was generally safe and well-managed, with deficiencies in the primary escapeway, the practice escapeway drills, and dispatcher training relatively isolated and predominantly arising in late 2005.  *See* PSIR ¶ 23; *see also* Ex. 1 (Agreed Facts) ¶¶ 5, 18, 21-27.  Though Aracoma does not excuse, but rather accepts responsibility for, the misconduct underlying the charges to which it

pled guilty, it is clear that misconduct is not systemic or condoned and that the agreed $2.5 million is sufficient punishment given the circumstances of the offenses.

### 2.    The Federal Sentencing Guidelines

As previously stated, although the USSG fine guidelines do not apply to Aracoma's violations, the governing statutory provision instructs the Court to give "due regard" to fines prescribed by guidelines applicable to "similar offenses and offenders." *See* 18 U.S.C. § 3553. In Aracoma's case, reference to the guidelines is entirely favorable because, as demonstrated below, were the guidelines applicable here the maximum fine would be *far less* than the agreed $2.5 million fine that the Government and Aracoma recommend to the Court.

Under the Guidelines, the nine counts for willful violation of a mandatory health or safety standard, all non-enumerated Class A misdemeanors, would have an initial base offense level of 6.    USSG § 2X5.2.    The single felony count of knowingly making false statements, representations, or certifications in a required mine record or document also would have an initial base offense level of 6.    *See* USSG § 2X5.1 ("If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline."); *see also* USSG § 2B1.1(a)(2) (base offense level for making false statements in violation of 18 U.S.C. § 1001 is 6).    Those counts, all involving substantially the same harm and the same transaction, would be grouped together in a single Group pursuant to USSG § 3D1.2.    Using the calculations set forth in USSG § 3D1.3, the offense level applicable to the Group also would be 6. For an "organization" such as Aracoma,[4] the applicable base fine for an offense level of 6 is $5,000.    USSG § 8C2.4(d).    The combined offense level calculated pursuant to Chapter 3

---

[4] The Application Notes provide that "organization" means "a person other than an individual," (*see* 18 U.S.C. § 18), and "[t]he term includes corporations …"    USSG § 8A1.1, Application Note No. 1.

Subpart D would still be subject to further potential adjustment for acceptance of responsibility (-2) under USSG § 3E1.1(a), which would reduce the combined offense level 4, also carrying an applicable base fine of $5,000.

That base fine is subject to an appropriate multiplier determined by the organization's "culpability score." USSG § 8C2.5. The starting culpability score of 5 in this case would be reduced by 3 points because Aracoma "had in place at the time of the offense an effective compliance and ethics program." USSG § 8C2.5(f)(1).[5] Indeed, Aracoma had an innovative, industry-leading, and award-winning program, as the rigorous requirements of Massey Energy Company's S-1 program held Aracoma's employees to compliance and ethics standards exceeding those of federal and state regulations. *See* PSIR ¶ 61; *see also* Ex. 7 (Overview of S-1 safety compliance and ethics program); Ex. 12 (Corporate Social Responsibility Report) at 4-11. The S-1 program is consistently recognized in the press for its innovation and its contribution to the development of important new safety practices and technologies. *See* Ex. 21 (News articles regarding S-1 program's innovations).

Under the S-1 program, the standards in place to prevent and detect unsafe conduct simultaneously prevent and detect any conduct that would constitute a criminal violation of federal or state mine safety regulations, including required comprehensive background checks on all prospective employees. Aracoma's senior management, and in particular its President Johnny

---

[5] The elements of an "effective compliance and ethics program" are set forth in USSG § 8B2.1 and require the organization to "(1) exercise due diligence to prevent and detect criminal conduct; and (2) otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law. Such compliance and ethics program shall be reasonably designed, implemented, and enforced so that the program is generally effective in preventing and detecting criminal conduct. The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective in preventing and detecting criminal conduct." USSG § 8B2.1(a). The minimum requirements for satisfying that standard are further detailed in USSG § 8B2.1(b).

Jones, is trained in implementing and overseeing the comprehensive S-1 compliance and ethics program and ensuring its effectiveness.  Furthermore, Aracoma has a specific Safety Director[6] to whom it assigns the responsibility and authority for day-to-day operation and oversight of the program.  The Safety Director reports regularly to high-level management both on employee compliance and on the program's overall effectiveness.  Aracoma constantly monitors and evaluates its S-1 compliance, including regular audits of its NFDL rates, and makes any necessary adjustments or improvements to ensure that its employees are working safely.

As an essential component of the S-1 safety and ethics programs, Aracoma employees have a variety of options for reporting or seeking guidance regarding potential or actual safety violations, including potentially criminal violations, without fear of retaliation.  *See* PSIR ¶ 61; *see also* Ex. 8 (Member Handbook) at 10.  In addition to reporting directly to company management or to the designated Safety Director, Aracoma employees and agents are given an "Ethics Hotline" telephone number, as well as an Ethics Alert Line mailing address and e-mail address, by which they may report or seek guidance on potential violations with complete anonymity and confidentiality.  *Id.*

Aracoma's S-1 safety compliance and ethics program is promoted aggressively by the company, not merely through discipline and retraining of violators, but prophylactically through its pioneering and award-winning "Raymond" safety incentive program.  Under the Raymond program, reward points are awarded to individuals, to working teams, and to specific mines for safe and ethical conduct, and those points may then be redeemed from a prize catalog that includes sporting goods, clothing, tools, electronics, toys, and other items.  *See* PSIR ¶ 62; *see also* Ex. 9 (Raymond Safety Program Press Release); Ex. 12 (Corporate Social Responsibility

---

[6] Lewis Sheppard is Aracoma's current Safety Director.  At the time of the fire, the Safety Director position was filled by Charles Conn.

Report) at 9.  The Raymond incentive program has been recognized nationally for its creativity and effectiveness in promoting a culture of safety and compliance, winning the 2007 and 2006 Promotional Products Association International's Golden Pyramid Award for Employee Incentives and the 2005 Incentive Marketing Association's Circle of Excellence award for Most Outstanding Incentive Program in the nation.  *See* Ex. 9 (Raymond Safety Program Press Release).

In addition to promotion through incentives and discipline, the standards and requirements of Aracoma's safety compliance and ethics program are communicated and emphasized to its employees and agents through effective training programs, a detailed Member Handbook, and written safety and ethics commitment agreements.  Aracoma sends mine foremen to the National Mine Health and Safety Academy, where MSHA trains mine employees on all aspects of mine operations, including fire safety and mine evacuation.[7]  As a result of these intensive classes, Aracoma employees historically have been sufficiently competent to perform their required duties at the mine, specifically including escapeway drills, provision of adequate escapeways, and maintenance of accurate and truthful mine records.  To be sure, Aracoma's employees ultimately failed in January 2006 to conduct and record proper escapeway drills and to provide and maintain adequate escapeways, but those failures were not due to a lack of available training.

Aracoma's employees are not only expected to be technically proficient, but also are held to the highest ethical standards.  Accordingly, the company requires employees to pledge,

---

[7]  The National Mine Health and Safety Academy is the seventh permanent Federal Academy, joining the Army, Air Force, Coast Guard, Maritime, Navy, and FBI Academies. It is responsible for training the mine safety and health inspectors and technical support personnel of the Mine Safety and Health Administration.  Mining professionals from across the United States and many foreign countries come to the Academy for health and safety training.  The Academy is located in Beckley, West Virginia.

through a Safety Commitment Agreement, to work safely, to avoid "unsafe shortcuts," and "to abide by the safety standards set by the company and regulations set by the federal and state governments."   *See* PSIR ¶¶ 61, 63; *see also* Ex. 10 (Safety Pledge) at 2; Ex. 8 (Member Handbook) at 2.   Aracoma employees also must sign an Ethics Commitment Agreement in which they agree to a Code of Behavior that provides: "No false or deceptive entries shall be made in the books and records of Massey Energy for any reason, and no member shall engage in any arrangement that results in such prohibited acts."   Ex. 11 (Ethics Commitment) ¶ 5; *see also* Ex. 8 (Member Handbook) at 6-12.

As a consequence of Aracoma's compliance and ethics program, prior to the January 19, 2006 fire, its employees knew to conduct proper escapeway drills, record those drills accurately and truthfully in Aracoma's books and records, and provide adequate and compliant escapeways from the working sections to the surface.   All employees were cognizant of their legal obligation to perform these duties and understood with certainty that the company expected them to fulfill these duties.   Though the training and ethics program sadly did not prevent the fatal accident here, it is comprehensive, sincere and innovative, and it warrants the three-point deduction under USSG § 8C2.5(f)(1).   *See* USSG § 8B2.1(a) ("The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective in preventing and detecting criminal conduct.").

A further reduction of two points off the culpability score also would be warranted because Aracoma "fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct."   USSG § 8C2.5(g)(2).   The Government here specifically agrees that Aracoma has cooperated with the U.S. Attorney's Office during the grand jury investigation of this matter and during plea negotiations, by

producing documents, providing factual information, and sharing legal research. *See* PSIR ¶¶ 54-55; *see also* Ex. 15 (Plea Agreement) ¶ 8. Aracoma also has paid full restitution to Mr. Hatfield and Mr. Bragg's families, fines totaling $2,500,000, civil penalties totaling $1,700,000, and all required special assessments. *Id.* Finally, Aracoma entered a guilty plea in this matter, thus accepting full responsibility for its employees' conduct. *See* PSIR ¶¶ 5-6; *see also* Ex. 20 (Guilty Plea); Ex. 15 (Plea Agreement). The company's cooperation and acceptance of responsibility, therefore, are plainly sufficient to warrant a two-point reduction.[8]

In view of the three-point reduction for Aracoma's compliance and ethics program and the additional two-point reduction for the company's cooperation and acceptance of responsibility, the applicable culpability score would be zero. USSG § 8C2.5. Under the applicable table of multipliers, a culpability score of zero warrants a minimum multiplier of .05 and a maximum of .2, which, when multiplied against the base fine of $5,000, results in a reduced fine range of $250 to $1,000. USSG § 8C2.6.

The significance of the guidelines analysis here is not to seriously suggest that Aracoma's appropriate fine is less than $1,000 in this case, but rather simply to show that it produces a fine range that falls well below the $2.5 million fine that Aracoma and the Government have agreed is proper and have recommended that the Court enter in this case. Recognizing that the agreed recommended fine significantly exceeds the range contemplated by this guidelines analysis, Aracoma nevertheless believes that the agreed fine is an appropriate resolution to reflect the seriousness of its commitment to redress the conduct that contributed to this tragedy.

---

[8]   Aracoma at a minimum must earn a one-point reduction of its culpability score because it "clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct." USSG § 8C2.5(g)(3).

### 3.  Other Statutory Considerations

In addition to the general sentencing criteria set forth in 18 U.S.C. § 3553(a), when the appropriate sentence to be imposed includes a fine the Court also shall consider the following factors in calculating the fine amount:  (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant; (3) any pecuniary loss inflicted upon others as a result of the offense; (4) whether restitution is ordered or made and the amount of such restitution; (5) the need to deprive the defendant of illegally obtained gains from the offense; (6) the expected costs to the government of any imprisonment or probation; (7) whether the defendant can pass on to consumers or other persons the expense of the fine; and (8) if the defendant is an organization, the size of the organization and any measure taken to discipline any responsible individual and to prevent a recurrence of such an offense.  18 U.S.C. § 3572(a); *see also USSG* §§ 8C2.1; 8C2.10.[9]  As with the analysis provided in the previous sections, a consideration of these factors similarly compels adoption of the agreed-upon fine here.

In the highly competitive coal market, imposition of a $2.5 million fine is substantial and burdensome to any company, regardless of its size or resources, and cannot simply be passed on to consumers.  It is thus significant punishment that will promote respect for law, deter future misconduct and protect the public.  The strongest mitigating factor here, however, is the exemplary measures that Aracoma took following the accident to retrain its employees and to improve its safety systems to ensure that such a tragedy never occurs again, measures that have proven successful in contributing to an award-winning safety record in the years since the fire.

---

[9]  Some of those statutory factors are obviously not relevant here, including pecuniary loss inflicted upon others or illegally-obtained gains.  *See* 18 U.S.C. § 3572(a).  The restitution and cost of probation factors are discussed separately below, and each supports the imposition of a fine no greater than the agreed $2.5 million.

Following the Alma No. 1 fire, Aracoma retrained its dispatchers and atmospheric monitoring system operators to ensure they are adequately trained in the mine's ventilation systems, firefighting procedures, and emergency evacuation procedures, and those dispatchers since have successfully passed MSHA's spot inspections testing those abilities. Aracoma also has installed state of the art sprinkler systems to extinguish fires immediately, implemented enhanced firefighting measures, including development of an innovative self-contained foam fire-fighting mine car, and provided training in new procedures for emergency mine evacuations and new mine rescue technologies. *See* PSIR ¶¶ 59-60; *see also* Ex. 16 (Fire Prevention and Response Measures); Ex. 17 (New Safety Initiatives Press Release).

Indeed, as discussed above, those remedial and preventive measures resulted in a NFDL rate of 0.00 in 2007, a remarkable achievement for which Aracoma received numerous accolades and prestigious national awards. *See* PSIR ¶ 64; *see also* Ex. 2 (MSHA Mine Overview for Alma No. 1); Ex. 3 (MSHA Mine Overview for Hernshaw); Ex. 6 (Graph Comparing Aracoma's NFDL rates against national rate); Ex. 13 (Holmes Association Press Release); Ex. 14 (Bradbury Award Press Release); Ex. 12 (Corporate Social Responsibility Report) at 9.

In the final analysis, the $2.5 million fine to which Aracoma and the Government agreed is adequate, appropriate, and warranted in this matter. As described in detail above, Aracoma has operated a comparatively safe mine over the course of its history, has maintained comprehensive compliance and ethics programs, responded quickly and extensively to its employees' misconduct by implementing significant new training and safety systems, and cooperated fully with the Government's investigation. Aracoma, from its senior management to its hourly employees, remains deeply affected by the loss of members Elvis Hatfield and Don Bragg, and does not for a moment minimize the loss to their families. It also, however, remains

deeply committed to keeping its mines among the safest in the nation and avoiding any recurrence of the events that contributed to the January 19, 2006 fire.  The agreed $2.5 million fine certainly is sufficient here to punish Aracoma for past mistakes and to deter future misconduct, and the Court should accept and enter that recommended fine amount.

### 4. Past Sentences for Similarly-Situated Defendants

In sentencing Aracoma, the Court also must consider the need to avoid unwarranted disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6).  The following four cases reflect past criminal fines imposed in connection with multiple fatality mine accidents, and collectively establish that the agreed $2.5 million fine here is, by comparison, quite substantial and certainly cannot be considered disparately low within the meaning of 18 U.S.C. § 3553(a)(6).

1. <u>Rapoca Energy Company</u>:  2 fatalities, $60,000 criminal fine (2001).

One miner was killed in a June 1998 roof collapse while removing roof support posts at a mine owned by Rapoca subsidiary Upper Mill Mining Co.  The death resulted from the mine operator's failure to examine the mine roof prior to removing the supports, failure to detect obvious roof hazards during pre-shift and on-shift examinations, failure to properly support and control the mine roof, failure to remove permanent roof supports by remote means only, and instructing the victim to remove the roof supports by repeatedly crashing his three-wheel personnel carrier into the support timbers.  Upper Mill and Rapoca pled guilty to 39 counts, including misdemeanor counts for willfully violating multiple safety requirements concerning roof support, nonpermissible electric equipment, pre-shift and on-shift examinations, and emergency medical assistance, and felony counts for knowingly falsifying mine safety records, including the fire drills records book and other mandatory training forms.

Another miner was killed in May 2000 when he was pinned in a corner and crushed by a continuous mining machine he was operating by remote control at a mine owned by Rapoca's Buchanan Production Co. subsidiary.  The death resulted from the mine operator's failure to adequately train the victim on use of the remote control unit, failure to provide an effective emergency stopping device on the remote unit, and willfully disabling the remote control unit's mechanical interlocks, designed to prevent accidental movement of the tram controls, by taping them in a position that rendered that critical safety feature inoperable.  Buchanan and Rapoca pled guilty to two misdemeanor counts for willfully violating safety standards, including for disabling the safety devices on the continuous mining machine and failing to conduct required fire drills, and to two felony counts for knowingly falsifying records, including the fire drills records book and other mandatory training forms.  The total criminal fine for the offenses related to the two fatalities was $60,000.

2.      <u>BHP Copper Inc.</u>:  4 fatalities, $400,000 criminal fine (1998).

Four miners were killed in August 1993 when they were buried under tons of debris at a Magma Copper Company (n/k/a BHP Copper) mine in Arizona after the internal structure of an underground shaft (or "raise") collapsed on them together with a massive ore blockage they were attempting to dislodge with explosives.  MSHA cited forty-six violations that included failure to follow requirements in the raise's design, installation, and maintenance; inadequate workplace safety examinations; failure to provide safe access to working areas; and failure to follow required safety practices in the storage, handling, and use of explosives.  Of the forty-six violations, thirty-six alleged Magma Copper's "unwarrantable failure" to comply with cited safety standards, thirty-eight were the result of "high negligence," forty-two alleged violations of a "significant and substantial" nature, and all were specially assessed under 30 C.F.R. § 100.5 for

heightened penalties.   The criminal fine for the offenses related to the four fatalities was $400,000.

3.     Pyro Mining Co.:  10 fatalities, $3,000,000 criminal fine (1993).

Ten miners were killed in a September 1989 methane gas explosion at a Pyro Mining (n/k/a Costain Coal Inc.) underground mine in Western Kentucky.  The fatal explosion allegedly resulted from the operator's allowing methane gas to accumulate to dangerous levels and improperly using and storing explosives.  Mine supervisors routinely falsified daily and weekly examination reports, including entries for methane levels, which concealed the existence of hazardous conditions from MSHA inspectors.  Pyro Mining pled guilty to twenty-two felony false statements counts, stemming from falsified records of methane levels, ventilation procedures, and use of explosives, and nine misdemeanor counts of willfully violating mandatory mine safety standards.  Individual Pyro employees were charged with obstruction of justice for destroying evidence, including pouring emulsion oil over incriminating mine records that reflected the existence of hazardous and illegal conditions.  Spanning nearly seven years of investigation and prosecution, Pyro Mining was considered the broadest criminal case in MSHA history.  Total criminal fines for the dozens of offenses in that ten-fatality case amounted to $3,000,000.

4.     J&T Coal Inc.:  4 fatalities, $1,079,000 criminal fine (1993).

Four miners were crushed to death in a massive February 1991 roof fall caused by shaving too much coal from support pillars.  The fatal accident resulted from the operator's failure to follow established roof control safety standards, in violation of both federal regulations and the mine's approved roof control plan.  J&T was convicted on six charges of willfully violating mandatory safety standards, specifically those provided in 30 C.F.R. § 75.202 (a) and

(b) (insufficient support and control of roof to protect persons from roof falls), 30 C.F.R. § 75.203 (a) and (b) (faulty pillar recovery methods incompatible with effective roof control), 30 C.F.R. § 75.220(a)(1) (failure to follow mine's approved roof control plan), and 30 C.F.R. § 75.1200-2(b) (inaccurate mine maps).  At sentencing, the trial court specifically found that the six violations caused the deaths of the four miners.  The total criminal fine was $1,079,000.

| Year | Operator | Fatalities | Fine |
|------|----------|------------|------|
| 2001 | Rapoca Energy Company | 2 | $60,000 |
| 1998 | BHP Copper Inc. | 4 | $400,000 |
| 1993 | Pyro Mining Co. | 10 | $3,000,000 |
| 1993 | J&T Coal Inc. | 4 | $1,079,000 |

### B.    Restitution

In imposing its sentence, the Court also is to consider "the need to provide restitution to any victims of the offense," 18 U.S.C. §§ 3553(a)(7) and 3572(a)(4), and the applicable USSG provisions here require the Court to impose a term of probation with a condition requiring restitution for the full amount of the victims' loss, as empowered by 18 U.S.C. § 3563(b)(2).  *See* USSG § 8B1.1(a)(2)[10]; *see also* 18 U.S.C. § 3563(b)(2) ("The court may provide, as further conditions of a sentence of probation, . . . that the defendant . . . make restitution to a victim of the offense under section 3556 . . . ").[11]

---

[10] Though the USSG fine guidelines apply only to specified offenses, the restitution provisions of Chapter Eight Part B "apply to the sentencing of all organizations for all felony and Class A misdemeanor offenses . . . even if the fine guidelines in §§ 8C2.2 through 8C2.9 do not apply." USSG § 8A1.1, Application Note No. 2.

[11] The cross-reference is to the general restitution provision: "The court, in imposing a sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A, and may order restitution in accordance with section 3663.  The procedures under section 3664 shall apply to all orders of restitution under this section."  18 U.S.C. § 3556.

1.    **Aracoma Has Satisfied its Restitution Obligations to Mrs. Bragg and Mrs. Hatfield, and They Do Not Seek Restitution in These Proceedings.**

Aracoma and the Government have agreed that the "Court will impose a term of probation with a condition requiring restitution for the full amount of the loss suffered by any victim of the offenses of which it will be convicted pursuant to this plea agreement." Ex. 15 (Plea Agreement) ¶ 5; *see also United States v. Stout*, 32 F.3d 901 (5th Cir. 1994) (Sentencing courts are permitted to impose restitution as a condition of supervised release to extent agreed to by government and defendant in plea agreement). The parties further agreed that "Delorice Bragg, individually and as administratrix of the estate of Don Israel Bragg ('Mrs. Bragg'), and Freda Hatfield, individually and as administratrix of the estate of Ellery Hatfield ('Mrs. Hatfield'), are victims within the meaning" of the USSG. Ex. 15 (Plea Agreement) ¶ 5.

The Guidelines and 18 U.S.C. § 3664 both specify that restitution shall be in "the full amount of the victim's loss." *See* USSG § 8B1.1(a); 18 U.S.C. § 3664(f)(1)(A). To fully satisfy that standard, "[t]he United States and Aracoma agree that this Court should consider the amount of money awarded to Mrs. Bragg and Mrs. Hatfield by the settlement of <u>Bragg and Hatfield v. Aracoma Coal Company, Inc. et al.</u>, Case No. 06-C-372-P, in the Circuit Court of Logan County, West Virginia, as satisfaction of this requirement." Ex. 15 (Plea Agreement) ¶ 5.

Though determining the full amount of the victims' losses for purposes of restitution "is a non-delegable judicial function," *United States v. Blake*, 81 F.3d 498, 507 (4th Cir. 1996), it is well established that plea "agreements may authorize restitution in an amount greater than the loss attributable to the offense of conviction," and courts follow such agreements. *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995); *see also Blake*, 81 F.3d at 507 (same). Under these circumstances, "[i]f the parties agree to a restitution amount in the plea agreement,

the plea agreement controls." *United States v. Robinson*, 1998 WL 789179, *5 (4th Cir. Nov. 13, 1998).

In this case, recognizing that the civil proceeding would be a better vehicle for assuring that Mrs. Hatfield and Mrs. Bragg were adequately and fairly compensated, the United States and Aracoma agreed to incorporate by reference the amounts paid to resolve the civil claims to satisfy Aracoma's restitution obligations.  Such an approach has been specifically blessed by the courts.  For example, in *United States v. Winkler*, 817 F. Supp. 1530, 1537 (D. Kan. 1993), the Court held that the defendant's restitution obligation was wholly satisfied by payment of a civil judgment when "the plea agreement explicitly envisioned a restitution amount as determined in the civil proceedings."   As a more general matter, it is a black letter rule that restitution obligations are offset by amounts the victims recover as compensatory damages for the same loss in a civil case, 18 U.S.C. 3664(j)(2); *see also United States v. Stanley*, 309 F.3d 611, 613 (9th Cir. 2002), whether by judgment or, as in this case, by settlement. *United States v. Harmon*, 156 Fed. Appx. 674, 676, 2005 WL 3293994 (5th Cir. Dec. 6, 2005) (citing *United States v. Cluck*, 143 F.3d 174, 180 n.9 (5th Cir. 1998).

Mrs. Hatfield and Mrs. Bragg have reiterated their desire to maintain the strict confidentiality of all terms of their civil settlement agreements, and thus both Mrs. Hatfield and Mrs. Bragg have knowingly and expressly waived their right to seek restitution in this criminal matter.  *See* PSIR ¶ 45.  Accordingly, the Court should adopt the approach taken in the Plea Agreement and consider Aracoma's restitution conditions of probation to be fully discharged by its payment of the civil settlement amount and by the victims' decision not to seek restitution.

2.      **The seven former Aracoma employees are not victims entitled to restitution.**

Seven former Aracoma employees submitted Declarations of Victim Loss claiming "psychological injury."  *See* PSIR ¶¶ 46-53.  Neither the Government nor Aracoma considers those employees "victims" under the VWPA or their alleged "psychological injury" compensable "loss" for purposes of restitution.

a.      **These former Aracoma employees are not "victims" because they were not directly or proximately harmed by any offense of conviction.**

Unlike Mrs. Bragg and Mrs. Hatfield, the seven former Aracoma employees are not victims entitled to restitution.  In the Fourth Circuit, "the district court plainly err[s] in ordering restitution to individuals who are not victims of the offense of conviction."  *United States v. Davenport*, 445 F.3d 366, 373 (4th Cir. 2006), *overruled in part on other grounds by Irizarry v. United States*, 128 S. Ct. 2198 (2008).  The VWPA defines "victim," in relevant part, as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . ."[12]  18 U.S.C. § 3663(a)(2).  To be considered "directly and proximately harmed" under the VWPA, "the act that harms the individual must be . . . conduct underlying an element of the offense of conviction."  *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *see also Davenport*, 445 F.3d at 374 ("A person is directly harmed, for purposes of the MVRA, when the harm results from conduct underlying an element of the offense of conviction.").[13]  To be a victim, then, one must be directly and proximately harmed by the actual

_____

[12] The VWPA applies here because section 3563(b)(2), which empowers the Court to order restitution as a condition of probation, requires that restitution shall be made under section 3556, which in turn directs the court to order restitution "in accordance with section 3663" and under the procedures of section 3664.  *See* 18 U.S.C. §§ 3556; 3563(b)(2); 3663; 3664.

[13] Cases interpreting restitution awards under the MVRA provide authority because, with one exception inapplicable here, "[t]he provisions of the VWPA and the MVRA are nearly identical

offense of conviction, rather than by the defendant's conduct generally.  And "if the harm to the person does not result from conduct underlying an element of the offense of conviction, . . . the district court may not order the defendant to pay restitution to that individual."  *Blake*, 81 F.3d at 506; *see also In re Doe*, 2007 WL 5041861, *3 (4th Cir. Aug. 9, 2007) (denying restitution claimant's petition for writ of mandamus because "we cannot conclude that [her harms from OxyContin addiction] were 'directly and proximately' related to the conduct underlying Purdue's offense of conviction so as to justify restitution under § 3663.").

The seven former Aracoma employees seeking restitution here were not directly or proximately harmed as a result of the offenses to which Aracoma pled guilty, which involved provision of a primary escapeway from the No. 2 section, dispatcher training, mine evacuation, and escapeway drills.  *See* Ex. 15 (Plea Agreement) at Information Counts I-X.  Indeed, even for the two true victims—Mr. Bragg and Mr. Hatfield—the Government charged that *only* the failure to provide a compliant primary escapeway from the No. 2 working section caused their injury.  *Id.*  Unlike Mr. Bragg and Mr. Hatfield, the six former members of the No. 2 section crew now seeking restitution were not harmed by the lack of a primary escapeway, as they all were able to exit the primary escapeway safely into the alternate escapeway and proceed unharmed past the fire and to the surface.[14]  *See* Ex. 1 (Agreed Facts) ¶ 14.  Because they were able to evacuate safely, these miners also were not directly or proximately harmed by any failures of dispatcher training, mine evacuation, or escapeway drills.  To the extent they suffered

---

in authorizing an award of restitution."  *United States v. Randle*, 324 F.3d 550, 555-56 & n. 2-3 (7th Cir. 2003).  The VWPA and MVRA definitions of "victim" are entirely identical.  *Compare* 18 U.S.C. § 3663(a)(2) (VWPA definition) *with* 18 U.S.C. § 3663A(a)(2) (MVRA definition).

[14] The seventh claimant, Jonah Rose, was the mine's "outby man," was not a member of the No. 2 section crew, and thus could not have been injured by the failure to provide a compliant primary escapeway from the No. 2 working section.

psychological injury from the events of January 19, 2006, it was not a direct or proximate result of Aracoma's offenses of conviction. *See Davenport*, 445 F.3d at 374; *Blake*, 81 F.3d at 506. The former employees, therefore, do not qualify as "victims" under the VWPA and are not authorized to receive restitution.

### b.    "Psychological injury" does not give rise to "loss" for which restitution may be ordered.

The former employees' restitution claims are predicated on lost earning capacity resulting from "psychological injury." *See* PSIR ¶¶ 47-53. Though the VWPA does provide restitution for psychiatric and psychological care expenses when an offense otherwise results in "bodily injury to a victim," 18 U.S.C. § 3663(b)(2)(A), it does not permit reimbursement of lost income for mere psychological injury in lieu of actual bodily injury. Noting consensus among the circuits on this point, the Eighth Circuit explained that, though the "plain language of § 3663(b)(2)(A)" authorizes restitution for psychiatric and psychological care where the offense results in bodily injury to a victim, "[t]he statute does not provide for such an order in the absence of bodily injury." *United States v. Reichow*, 416 F.3d 802, 805 (8th Cir. 2005). The Fourth Circuit has reached the same result interpreting the identical language of the MVRA, twice reversing erroneous restitution orders on the grounds that the statute "requires proof of bodily injury to a victim before a court may order restitution for [psychological] counseling." *United States v. Manna*, 2006 WL 2784189, *2 (4th Cir. Sept. 28, 2006). *See also United States v. Powell*, 2002 WL 1733819, *6 (4th Cir. July 29, 2002) ("restitution orders can only cover psychological care when there has been a bodily injury.").

These holdings establish conclusively that "psychological injury" does not equate to the required "bodily injury" for purposes of 18 U.S.C. § 3663(b)(2). Accordingly, the First Circuit recently vacated a restitution order because, "to the extent the district court based a portion of

30

each victim-buyer's restitution award on the emotional impact of the crime perpetrated against him or her, it erred." *United States v. Innarelli*, 524 F.3d 286, 295 (1st Cir. 2008). More pointedly, another federal district court recently denied restitution for claimed post-traumatic stress disorder on the grounds that the claimant's PTSD was a psychological injury rather than a bodily injury, holding "that the Defendant is not required to pay Ms. McInrey restitution under the MVRA. PTSD is a *psychological injury, not a bodily injury*. Accordingly, the court may not order Defendant to pay restitution under the MVRA." *United States v. LaBarge*, 2007 WL 171992, *3-*4 (N.D. Iowa Jan. 17, 2007) (emphasis added) (internal citation omitted); *see also United States v. Serawop*, 505 F.3d 1112, 1124 (10th Cir. 2007) (noting that court may not order restitution for "mental anguish"). So too here with the former employees' claims of "psychological injury." Both Aracoma and the Government agree that, because they did not suffer any bodily injury as a direct and proximate result of conduct underlying an element of the offense of conviction, the seven former Aracoma employees are not entitled to restitution for their claimed psychological injuries or for lost income attributable to those psychological— rather than bodily—injuries.

> **c.    Determining the complex issues of causation and "psychological injury" would unduly complicate, prolong, and burden this criminal sentencing process and thus is better left to the ongoing civil proceedings.**

The Court shall not enter a restitution order as a condition of probation to the extent it finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." USSG § 8B1.1(b)(2)(B); *see also* 18 U.S.C. § 3663(a)(1)(B)(ii) ("To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the

fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.").  In light of that limitation, courts "view the requirement that the harm have been 'proximately' caused as a reflection of Congress's interest in maintaining efficiency in the sentencing process, as the term 'proximate cause' is sometimes used 'to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts.   At bottom, the notion of proximate cause reflects ideas of what justice demands, or of *what is administratively possible and convenient*.'"   *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006) (emphasis in original) (quotations omitted).

As discussed above, these former employees' claims to restitution are plagued by fatal attenuation of direct and proximate causation.  Thus, the VWPA's complexity exception should preclude resolution of those difficult causation questions in the context of Aracoma's criminal sentencing.  "Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof" on causation, intending instead "that the process of determining an appropriate order of restitution be 'streamlined' . . . and that the restitution 'determination be made quickly.'"  *Reifler*, 446 F.3d at 136 (citing S.Rep. No. 104-179, at 20-21, *as reprinted in* 1996 U.S.C.C.A.N., pp. 933- 34.)   Indeed, in enacting the identical complexity exception for the MVRA, the Senate Report specifically instructed "that cases 'in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution,'" *id.*, and that "[i]n all cases, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution."  *Id.* at 19.  Faced with complex and attenuated claims of causation similar to those raised by the former Aracoma employees here, another district court in this circuit recently invoked the VWPA's

complexity exception, and justifiably so, concluding that "the restitution process would unduly complicate and prolong the sentencing process.  In order to prove causation, litigation over many months, if not years, would be required before final judgment in this case could be entered.  Such delay would be contrary to the basic principles of our criminal justice system."  *United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007).  The causation difficulties here present those same concerns of complexity and delay, rendering restitution inappropriate.

In addition to causation problems, the inherent complexity in quantifying these employees' alleged "injuries" weighs strongly against a restitution order here.  Even when a true victim claims lost future income based on bodily injuries—which is at least authorized, unlike lost income from psychological injury—"[i]f the amount of future income is contested by a defendant and the district court finds that determining the proper amount would be unduly burdensome and time-consuming, the court has the discretion to decline to award future income in the restitution order."  *United States v. Oslund*, 453 F.3d 1048, 1063 (8th Cir. 2006).  In their responses to interrogatories in the parallel civil proceeding, the former employees now seeking restitution could not quantify any injury, instead promising only that "[e]conomic loss analysis will be set forth by expert opinion."  No such expert opinions were ever submitted, and the civil trial court accordingly ordered the former employees to submit to physical and mental independent medical examinations ("IMEs") to determine whether they have suffered *any* injury whatsoever.  The employees thus far have refused to submit to the court-ordered IMEs.  Aracoma not only contests the availability of restitution for psychological injury generally, but if necessary would contest vigorously the purported "lost income" amounts specifically claimed here, including by presenting rebuttal expert evidence.  The specter of extensive medical discovery, complicated expert testimony, and contested IMEs all weigh heavily in favor of

resolving those complex issues in the more aptly-suited civil proceeding and weigh heavily against attempting to adjudicate them in connection with Aracoma's criminal sentencing.

In such circumstances, "[i]t is not surprising that the district judge [would] not want to encumber the sentencing process with an elaborate damage calculation requiring expert testimony, but we infer from this not that an arbitrary or unsubstantiated calculation is proper but that projecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute." *United States v. Fountain*, 768 F.2d 790, 802 (7th Cir. 1985). Following *Fountain*, the Eighth Circuit also recently held "that restitution orders that require a court to calculate lost future earnings are unduly burdensome and complicated and as such are not authorized by the VWPA, unless the amount in question requires no calculation, such as when it is uncontested." *Oslund*, 453 F.3d at 1063. Therefore, invoking the complexity exception in 18 U.S.C. § 3663(a)(1)(B)(ii), "a burdensome, complicated, or speculative calculation provides a good reason for the district court to decline to exercise its discretion in favor of including future lost income in a restitution order." *Id.* The complexity and impropriety of conducting an extensive mini-trial on seven former employees' contested claims of lost future income, attributed to alleged "psychological injuries," would severely burden and delay Aracoma's criminal sentencing process and thus weighs against an order of restitution.

Finally, as recognized in paragraph 46 of the Presentence Report, these seven former Aracoma employees now claiming restitution in Aracoma's criminal sentencing are also plaintiffs in pending civil actions seeking the very same damages. *If* they indeed have meritorious claims for injury, which Aracoma disputes, appropriate compensation would be available to them in their ongoing civil suits, each of which has been pending for more than a year and is substantially progressed in the Logan County Circuit Court. Courts agree that "[t]he

existence of pending civil litigation may in some cases be relevant to the balancing test" set forth in the statute's "complexity exception," because where a related civil suit has significantly progressed "the victim's need to rely upon the sentencing process for compensation may be lessened to some degree."  *United States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008).  This principle applies *a fortiori* here, where there is absolutely no risk that Aracoma would be unavailable or unable to satisfy a civil judgment.  This simply is not a case, such as with fraud defendants or individual criminals with no resources, where the restitution process is necessary to guarantee a recovery.  Aracoma will be existing, willing, and able to satisfy any civil judgment should the Logan County Circuit Court find that compensation is warranted.

Accordingly, in enacting the MVRA, Congress announced very clearly its specific intention that such *civil* courts, rather than a criminal court at sentencing, would resolve all complicated issues of causation and quantification:  "It is the committee's intent that courts order full restitution . . . , while guaranteeing that the sentencing phase of criminal trials do not become fora for the determination of facts and issues *better suited to civil proceedings*."  S.Rep. No. 104-179, at 18., *as reprinted in* 1996 U.S.C.C.A.N., pp. 924, 931 (emphasis added).  In including that instruction in the Senate Report, Congress not only validated that civil proceedings are a better vehicle than criminal sentencing for assuring victims' adequate and fair compensation in cases of contested and complex causation or loss, but also that the civil justice process in such cases should not be circumvented by simultaneous and expedited pursuit of the same damages under the guise of criminal restitution.  In other words, the Court here both *need* not resolve those difficult issues to assure itself that the alleged victims will receive any due compensation, and *should* not undertake resolution of those issues in deference to the Logan County Circuit Court that Congress has deemed "better suited."  Clearly the complicated and hotly-contested issues of

causation and valuation attendant to the former employees' restitution claims would unduly burden the sentencing process here and, in light of the availability of any due compensation in the pending civil suits, the Court should decline to enter an order of restitution under 18 U.S.C. § 3663(a)(1)(B)(ii) and USSG § 8B1.1(b)(2)(B).

### C.      Probation

The applicable sentencing statutes also provide for a term of probation "not more than five years" for the nine misdemeanor violations and "not less than one nor more than five years" for the single felony violation.  18 U.S.C. § 3561(c)(1)-(2); *see also* USSG § 8D1.2(a)(1)-(2).  Accordingly, the Plea Agreement and PSIR recognize that the total maximum penalty to which Aracoma will be exposed by virtue of its guilty pleas includes "a term of probation of at least one and not more than five years."  *See* PSIR ¶¶ 73-74; *see also* Ex. 15 (Plea Agreement) ¶ 3d.

The minimum required one year of probation is the appropriate term here, considering Aracoma's satisfaction of its financial obligations and the significant remedial and preventive measures Aracoma already has taken, and continues to take, to prevent recurrence of these offenses.  As part of its Plea Agreement, Aracoma has paid significant fines, civil penalties, restitution, and special assessments.  In connection with its January 14, 2009 guilty plea, Aracoma already has paid the full amount of the agreed criminal fine and special assessments into the Court's registry, thus there is no need for an extended period of probation to ensure full satisfaction of those financial obligations.  *See* PSIR ¶¶ 69-70; *see also* Ex. 22 (Fine Payment); Ex. 23 (Special Assessment Payment).  The same is true of Aracoma's civil penalty obligation. *See* PSIR ¶ 55; *see also* Ex. 24 (Civil Penalty Payment).  Similarly, as discussed above, Aracoma already has satisfied its restitution obligations through settlement of the victims' civil claims, obviating the need for an extended probation period for that condition.

Finally, as detailed above, Aracoma already has responded to this tragedy by implementing significant and extensive new training and safety systems to prevent recurrence. In light of that voluntary and sincere commitment, it would be unnecessary for the Court and Probation Department to incur costs supervising a term of probation any greater than the one year required by 18 U.S.C. § 3561(c)(1) and USSG § 8D1.2(a)(1).

## CONCLUSION

For all of the reasons mentioned above, Aracoma respectfully submits that the sentence recommended in the Plea Agreement is the appropriate sentence in this matter.


Date:   April 8, 2009


/s/ Neva G. Lusk                                    
Mark E. Heath  (WV State Bar #5515)
Neva G. Lusk (WV State Bar #2274)
Spilman Thomas & Battle, PLLC
Post Office Box 273
Charleston, West Virginia 25321-0273
Telephone: (304) 340-3800
Facsimile: (304) 340-3801
E-mail:  mheath@spilmanlaw.com


/s/ Robert D. Luskin                              
Robert D. Luskin, *pro hac vice*
PATTON BOGGS, LLP
2550 M. Street, NW
Washington, D.C. 20037-1350
Telephone: (202) 457-6190
Facsimile: (202) 457-6315
rluskin@pattonboggs.com

Counsel for Aracoma Coal Company

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**UNITED STATES OF AMERICA**

      **v.**                             **Criminal No. 2:08-00286**

**ARACOMA COAL COMPANY**

**CERTIFICATE OF SERVICE**

I, Neva G. Lusk, counsel for Aracoma Coal Company, hereby certify that on April 8, 2009, I filed the foregoing "Aracoma Coal Company's Sentencing Memorandum" through the Court's CM/ECF system, which will send notification of such filing to the following:

        Hunter P. Smith, Jr., Esquire
        Assistant United States Attorney
        Post Office Box 1713
        Charleston, WV 25326

               /s/ Neva G. Lusk_____
               Mark E. Heath (WV State Bar #5515)
               Neva G. Lusk (WV State Bar #2274)
               Spilman Thomas & Battle, PLLC
               Spilman Center
               Post Office Box 273
               Charleston, West Virginia 25321-0273
               (304) 340-3800
               (304) 340-3801 (facsimile)
               mheath@spilmanlaw.com