```
 1                 IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF WEST VIRGINIA
 2                          AT CHARLESTON

 3     ------------------------------x
                                     :
 4     UNITED STATES OF AMERICA,      :
                                     :
 5          v.                        :    CRIMINAL NO. 2:08-00286
                                     :
 6     ARACOMA COAL COMPANY, INC.,    :    APRIL 15, 2009
                                     :
 7              Defendant.            :
       ------------------------------x
 8

 9                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
10                   UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     FOR THE UNITED STATES:      USA CHARLES T. MILLER
                                   AUSA HUNTER P. SMITH, JR.
13                                 U.S. Attorney's Office
                                   P.O. Box 1713
14                                 Charleston, WV  25336

15     FOR THE DEFENDANT:          ROBERT D. LUSKIN
                                   Patton Boggs, LLP
16                                 2550 M Street, NW
                                   Washington, D.C.  20037
17
                                   MARK E. HEATH
18                                 Spilman, Thomas & Battle
                                   P.O. Box 273
19                                 Charleston, WV  25321

20     PROBATION OFFICER:          LEE CUEVA
                                   U.S. Probation Office
21                                 300 Virginia Street East
                                   Charleston, WV  25301
22

23     COURT REPORTER:             BARBARA STEINKE, RMR
                                   Post Office Box 75025
24                                 Charleston, WV  25375
                                   (304) 347-3151
25
```

1                    P R O C E E D I N G S          1:39 p.m.

2           THE CLERK:  The case before the court is the *United*

3    *States of America versus Aracoma Coal Company*, Criminal No.

4    2:08-00286.  Would counsel note their appearance for the record,

5    please.

6           MR. SMITH:  For the government, Your Honor, United

7    States Attorney Charles T. Miller and Assistant United States

8    Attorney Hunter Smith.

9           MR. LUSKIN:  Good afternoon, Your Honor.  Robert Luskin

10   for the defendant Aracoma Coal Company.  With me is my

11   colleague, Mark Heath; and also present, Your Honor, is Johnny

12   Jones, the president of Aracoma Coal Company.  As I mentioned

13   when we were here in January, he joined Aracoma about eight

14   months after the accident, but is familiar with the matters.

15          THE COURT:  Very good.  It may be that Mr. Jones should

16   be sworn.

17          THE CLERK:  Please stand and raise your right hand.

18      (Johnny Jones was sworn.)

19          THE COURT:  Mr. Luskin, have you, together with

20   Mr. Jones, been over the probation department's presentence

21   report in this case?

22          MR. LUSKIN:  Yes, Your Honor, we have.

23          THE COURT:  And I take it it's fair to say you've been

24   over it thoroughly --

25          MR. LUSKIN:  Quite thoroughly, sir.

United States v. Aracoma Coal Company                    3

1        THE COURT:  -- as one can tell from the sentencing

2   memoranda.  And I would ask whether or not the defendant has any

3   objections to the report.

4        MR. LUSKIN:  None, Your Honor.  I'm sorry to say, I've

5   become acquainted with Ms. Cueva's work, and it's its usual high

6   standard.  She does note in the revised presentence report that

7   there was an objection concerning restitution.  In fact, it

8   certainly was not an objection to any of the representations in

9   the presentence report, but simply our effort to raise issues

10  which are for the court's consideration about whether or not

11  certain of the individuals may be victims.  But with respect to

12  the report itself, we have no objections, sir.

13       THE COURT:  Very good.

14     And Mr. Jones, that is your understanding as well, is it?

15       MR. JONES:  Yes, sir.

16       THE COURT:  Thank you.

17     Does the government have any objections?

18       MR. SMITH:  No, Your Honor.

19       THE COURT:  Thank you.

20     Let me ask -- first of all, I take it the parties are in

21  agreement that the sentencing guidelines do not apply to the

22  calculation of a fine in this case; is that correct?

23       MR. SMITH:  Yes, Your Honor.

24       MR. LUSKIN:  Yes, sir, that is correct.

25       THE COURT:  Thank you.

1    The court is interested, Mr. Smith, in ascertaining what

2  steps have been taken by the United States Attorney to notify

3  any possible victims in this matter.

4         MR. SMITH:  Your Honor, our office has provided notice

5  of status as a potential victim to really three groups of

6  miners:  The miners who were on the 2 section which was the

7  section where Mr. Bragg and Mr. Hatfield were; miners --

8         THE COURT:  And that would be twelve in number?

9         MR. SMITH:  Yes, Your Honor, I believe that's correct.

10 That's the number of men on the crew originally, yes.

11        THE COURT:  At the No. 2 section.

12        MR. SMITH:  Yes, on that shift.

13   We also notified all the miners who were on the longwall

14 shift at that time who we believe we have correctly and

15 completely identified.

16   We also notified a third group, three individuals, who were

17 involved in discovery and fighting the fire within the first few

18 minutes.  That would be Bryan Cabell, Patrick Callaway, and

19 Jonah Rose.  All of those individuals, Your Honor, have received

20 notice from the United States that they might be -- they might

21 have rights as victims in this prosecution.

22        THE COURT:  Those three individuals, were they in

23 addition to what I understand to be the nine who were on the

24 longwall section?

25        MR. SMITH:  Yes, Your Honor.  I believe none of those

1    three were on the longwall shift at that time.

2            THE COURT:  And so, that accounts for I think probably

3    twenty-six.  I understand there were a total of twenty-nine

4    miners who entered the mine on that shift.  Where would the

5    other three have been?

6            MR. SMITH:  They were not -- they were not inside the

7    mine.  They were not -- if I may use the jargon word, they were

8    not in by the fire.  They were between the fire and the entrance

9    to the mine, the surface entrance to the mine.

10           THE COURT:  Do I understand you to say then that the

11   government has notified everyone whom it believes could possibly

12   have a claim as a victim in this matter?

13           MR. SMITH:  Yes, Your Honor.

14           THE COURT:  And secondly, what victim impact statements

15   have you received in the matter, if any?

16           MR. SMITH:  Your Honor, in addition to the ones

17   received by -- that have been provided to Ms. Cueva, we

18   received --

19           THE COURT:  And those being?

20           MR. SMITH:  If I may --

21           THE COURT:  Is that on behalf of Mr. Bragg and

22   Mr. Hatfield --

23           MR. SMITH:  Well --

24           THE COURT:  -- their respective estates?

25           MR. SMITH:  No, that's not what I meant, Your Honor.

1          THE COURT:  All right.

2          MR. SMITH:  If I may then.  Of course, the

3   representatives of Mr. Bragg and Mr. Hatfield were -- were

4   notified.  They did not file any victim witness statement.  And

5   Mr. Stanley and Ms. Hatfield are here today, and will address

6   the court at some point, I believe, regarding that -- those

7   matters.

8      With respect to the 2 section miners, most of them are

9   represented by --

10          THE COURT:  By that, you mean the No. 2 section miners.

11          MR. SMITH:  Yes, Your Honor.  Most of those are

12   represented by a couple of lawyers, Sam Hrko and Tim Bailey.

13   Those are Gary Baisden, Randy or Randall Crouse, Steve Hensley,

14   Joseph Hunt, Patrick Kinser, Harold Shull, Thomas Vanover.

15   Those were the 2 section miners notified.

16          THE COURT:  Okay.  Those are the No. 2 section miners

17   that were notified.

18          MR. SMITH:  Yes.

19          THE COURT:  And there are seven in number who are

20   represented, did I understand you to say --

21          MR. SMITH:  Yes, Your Honor.

22          THE COURT:  -- by Mr. Hrko and perhaps Mr. Bailey?

23          MR. SMITH:  Yes, Your Honor.

24          THE COURT:  Very good.  And as I understand it, I think

25   all seven of those individuals have filed a notice of their

1    claim with Ms. Cueva; is that correct?  Is that how you received

2    those?  Did they come directly to you, Ms. Cueva?

3              THE PROBATION OFFICER:  Your Honor, some of them came

4    directly to me from the potential victims and some came from the

5    United States Attorney's Office through their victim witness

6    coordinator.

7              THE COURT:  But those seven include all of them.

8              THE PROBATION OFFICER:  Correct.

9              THE COURT:  Thank you.

10             MR. SMITH:  Those same two lawyers represent one other

11   individual, Your Honor.  I believe he has provided material

12   either directly or indirectly to probation.  His name is Jonah

13   Rose.  He was not a 2 section miner.

14             THE COURT:  Did you say Rose?

15             MR. SMITH:  Rose, R-o-s-e, Your Honor.

16             THE COURT:  Is that the same as the individual who was

17   attendant at the time efforts were being made to put out the

18   fire?

19             MR. SMITH:  Yes.

20             THE COURT:  Thank you.

21             MR. SMITH:  Yes.

22             THE COURT:  And the notice that was given by the United

23   States Attorney to all of these individuals, in what form did it

24   go and of what were they notified?

25             MR. SMITH:  Your Honor, the victim witness coordinator

1  in our office notified in writing those individuals, I believe

2  most of them, both through their attorney and individually.

3  Most of those individuals asked both that their attorney be

4  notified and that the individual himself get notice.  The form

5  of the notice itself --

6        THE COURT:  You are telling me about most of them.  I

7  want to know about all of them.  And so, I want you to be

8  comprehensive; or if you cannot tell the court that that which

9  you are stating applies to each and every one of them, you need

10 to tell me to whom it did apply and to whom it didn't.

11       MR. SMITH:  With respect to the No. 2 section miners,

12 those seven miners that I named, Mr. Baisden himself and his

13 attorney was notified, Mr. Crouse and his attorney were

14 notified, Mr. Hensley and his attorney were notified, Mr. Hunt

15 and his attorney were notified, Mr. Kinser and his attorney were

16 notified, Mr. Shull and his attorney were notified, Mr. Vanover

17 and his attorney were notified.  All seven of those were

18 individually notified, as well as notice going to their

19 attorney.

20       THE COURT:  And we understand that they were notified

21 because they have filed their losses with the court.  What about

22 the others who have not filed an impact statement or have not

23 otherwise been heard?

24       MR. SMITH:  Well, Your Honor, if I may complete the

25 list of people who have made some response first, I mentioned

 1  that Mr. Rose has, and notice was sent to Mr. Rose and to his
 2  attorney.  One additional miner on the longwall is named Johnny
 3  Brown.  Mr. Brown is represented by Mrs. Tonya Hatfield, and
 4  notice was given to him both personally and through his
 5  attorney.  With respect to Mr. Brown, Ms. Hatfield filed with me
 6  last week at the guilty plea hearing of David Runyon some
 7  medical records to serve as notice of his potential status as a
 8  person entitled to restitution.  That was done a little bit late
 9  in the process and hasn't been provided to probation yet and
10  hasn't been provided to defense counsel in any way and is not
11  referenced in the presentence report, and I can address that
12  further at an appropriate time.
13      Also, a longwall miner --
14          THE COURT:  What was the name again?
15          MR. SMITH:  Johnny Brown.  He and his counsel are
16  present here today.
17          THE COURT:  Very good.  Then they can answer us in a
18  moment as to whether or not they are presenting a claim.
19          MR. SMITH:  And, finally, Your Honor, we received a
20  response from a longwall miner named -- I think it's Jammie,
21  J-a-m-m-i-e, Adkins.  He is not represented by an attorney.  I
22  believe that a copy of that was provided to Ms. Cueva by our
23  victim witness coordinator.  Those are the only individuals in
24  that group who have responded to the notices we sent.
25          THE COURT:  My question of you was, what notice went

1   and to whom.  And if you can tell me comprehensively, I'll be

2   pleased to accept it.  Has the United States Attorney seen that

3   notice went to the 26 individuals that you have referred to out

4   of the 29 that were underground that day, three of whom may not

5   have been underground at all?  That's really my question of you.

6        MR. SMITH:  The seven miners on the No. 2 section who

7   I've listed got notice personally and through their counsel.

8   Three other miners on that section, Mr. Plumley, who was the

9   foreman, got notice both directly to himself and to his

10  attorney, Mike Fisher.  Two other miners on that section got

11  individual notice, Elmer Mayhorn and Billy Mayhorn; and Billy

12  Mayhorn, his attorney, Dwane Tinsley, also got notice of Billy

13  Mayhorn's potential status as a victim.

14        THE COURT:  When you say they got notice, is it they

15  had notice to file a victim impact statement or a declaration if

16  they wished to do so?

17        MR. SMITH:  Yes, Your Honor.

18        THE COURT:  Any other notified of this sentencing

19  hearing today?

20        MR. SMITH:  These were all notified of the sentencing

21  hearing today, as I've indicated, either individually or

22  individually and with a lawyer.

23        THE COURT:  You seem now to have covered everyone on

24  Section 2, there being twelve.  What about everyone else?  They

25  also received this same notice?

1          MR. SMITH:  Yes.  On the group of three, Your Honor,

2    Jonah Rose, through his attorney and individually, got notice;

3    Mr. Bryan Cabell got notice simply to his attorney, Thomas

4    Scarr; and Mr. Calloway, I believe, got only individual notice,

5    and to our knowledge, he has no attorney.

6          THE COURT:  And so, you have no word of any other

7    claims, if I understand it, besides those that have been filed,

8    save for Mr. Adkins and Mr. Brown.

9          MR. SMITH:  Yes, Your Honor.

10         THE COURT:  And I understand Mr. Brown is present and

11   perhaps his attorney is with him; and if that's the case, I

12   would ask whether or not there is a claim on his behalf to be

13   filed seeking restitution in this matter.

14         MR. SMITH:  Your Honor, his attorney is Tonya Hatfield.

15   May she come forward --

16         THE COURT:  Certainly.

17         MR. SMITH:  -- to address the court?

18         MS. HATFIELD:  Thank you, Your Honor.  May it please

19   the court.

20         THE COURT:  Yes, ma'am.

21         MS. HATFIELD:  I'm Tonya Hatfield representing Johnny

22   and Kimberly Brown in a Logan County Circuit Court action now

23   pending, and that trial is set for October 26th of this year.

24   There is actually mediation that is already scheduled for July

25   16 of this year.  We anticipate we may resolve the issues at

1    that time.

2        I noticed in the defendant's presentence memorandum, that

3    there was reference to seven of the miners being survivors and

4    some allegations made with regard to restitution.  I would

5    submit on behalf of Johnny Brown, that he has suffered physical

6    manifestations of psychological injury.  He has also suffered

7    physical injuries as a result of this.

8        And so, I've spoken with Mr. Hunter Smith of the U.S.

9    Attorney's Office, and one of the things that we discussed was

10   the possibility of deferring on whether or not Johnny Brown

11   would want to claim restitution at a later time.  I'm not sure

12   if the court would be able to entertain that.  Certainly

13   Mr. Brown does not want to hold up these proceedings or cause

14   any undue burden to the court in the context of this criminal

15   matter.

16       So we would look to the court for guidance at this point in

17   time, Your Honor.

18           THE COURT:  Well, the court expected that you would

19   have filed notice of any claim that you have by this time.  The

20   plea was taken in this case three months ago; and I gather from

21   what Mr. Smith has stated, that there has been adequate notice

22   that has gone to each of the individuals who may have a claim.

23       And so, the court is interested, if you have a claim, in

24   stating it and filing it in writing, of course.  I am not

25   inclined to continue these proceedings unless there is some

 1  compelling reason to do so.  And if there is, the court will do

 2  just that.  But I haven't heard any reason why it should not

 3  already have been filed.

 4          MS. HATFIELD:  There is none, Your Honor.  I've

 5  consulted with Mr. Brown and his wife, and at this time they are

 6  not making a claim for restitution.  So, if asked to give a

 7  definitive answer, there is no claim for restitution.

 8          THE COURT:  Thank you.

 9     Let me ask if you have anything further.

10          MS. HATFIELD:  No.

11          THE COURT:  Thank you, Ms. Hatfield.

12     Reference was made in Mr. Smith's remarks to something that

13  may have been filed with the probation officer by Mr. Adkins.

14  Did I understand that correctly?

15          MR. SMITH:  Yes, Your Honor.  I'm sorry, does Ms. Cueva

16  have that?

17          THE PROBATION OFFICER:  I don't believe the probation

18  has that -- office has that.  Everything the probation has has

19  been filed with the court.

20          THE COURT:  All right.  Thank you.

21          MR. SMITH:  Your Honor, if I might have just a moment.

22          THE COURT:  Go ahead.

23          MR. SMITH:  May I consult with Ms. Cueva for just a

24  moment?

25          THE COURT:  You may.

1        (Pause.)

2              MR. SMITH:  Your Honor, that may have been my mistake.

3    There was -- there was a claim received in writing in the form

4    prescribed by our office, and I apparently failed to get it to

5    Ms. Cueva in a timely fashion, but Mr. Adkins did file the

6    claim.  I'm not sure defense counsel has seen it since it didn't

7    get to Ms. Cueva.  It does seem not to allege, even in

8    conclusory terms, any bodily injury, but he did file in writing

9    a victim impact statement and I would be happy to provide copies

10   to the parties or the court at this time or an appropriate time.

11             THE COURT:  Well, it looks to me as though you are

12   handling a two-page document; and if that is the case, I'm going

13   to ask you to turn it over to Mr. Luskin and he can look at it

14   quickly now and I can look at it as well, and the parties then

15   can tell me what position to take with respect to it.

16             MR. SMITH:  Thank you, Your Honor.

17        Your Honor, might I approach --

18             THE COURT:  Please.

19             MR. SMITH:  -- with Mr. Adkins' victim impact

20   statement?

21             THE COURT:  May I review that a moment.

22        I wanted to inquire as well whether or not Mr. Adkins would

23   have been one of the surviving ten out of the Section 2 group.

24             MR. SMITH:  No, Your Honor.  He was on the longwall.

25             THE COURT:  All right.  Thank you.  And I take it

 1    there's no objection to filing this victim impact statement on

 2    behalf of Jammie Edward Adkins.

 3            MR. SMITH:  No objection, Your Honor.  I might ask it

 4    be filed under seal to protect Mr. Adkins' privacy.

 5            MR. LUSKIN:  Your Honor, no objections, and we would

 6    concur in the recommendation, consistent with the statute, that

 7    it be filed under seal.

 8            THE COURT:  The court will file it under seal until the

 9    further order of the court.

10      Let me ask about the seven that have already been filed.

11    Have they been filed at all with the court?  And, more

12    particularly, I don't recall those being filed under seal.

13            MR. SMITH:  They have not been filed with the court.

14    They have been provided to the probation department.  I believe

15    counsel has them, but they have not been filed with the court.

16    We will do that at the court's direction if it wishes.

17            THE COURT:  Well, we may handle that in keeping with

18    some further colloquy with counsel for those individuals at this

19    hearing --

20            MR. SMITH:  Thank you, Your Honor.

21            THE COURT:  -- and we'll decide that at a later time.

22      Anything further on the Adkins' matter at this time?

23            MR. SMITH:  No, Your Honor.

24            MR. LUSKIN:  No, Your Honor.

25            THE COURT:  Thank you.

1    In addition to those filings, the court has heard earlier on

2  behalf of Ms. Bragg and Ms. Hatfield, and can the government

3  tell me what position of each Ms. Bragg and Ms. Hatfield and the

4  estates of each of their deceased husbands is now with respect

5  to restitution.

6         MR. SMITH:  Yes, Your Honor.

7    Mr. Stanley and Ms. Hatfield are here who represent these

8  estates, these individuals, and can address the court.  The

9  position they take and the one that the United States supports

10 is, first, that they do not seek restitution in this criminal

11 case.  They are willing to waive any right they have to

12 restitution in this criminal case.

13   And second, they do not wish to advise the court of the

14 terms of the settlement agreement.  They desire that it remain a

15 private, nondisclosed matter.  And the United States submits

16 that given that they are not seeking restitution and are willing

17 to make representations to the court specifically to that end,

18 that there really is little need to get that figure.  The United

19 States does not know that figure, Your Honor.

20         THE COURT:  The United States what, sir?

21         MR. SMITH:  Does not know the civil settlement figure.

22         THE COURT:  Thank you.

23   And if there's nothing further from the government on that

24 matter, I want to call on Mr. Stanley in just a moment, but,

25 Mr. Luskin, have you anything further on that?

1           MR. LUSKIN:  No, Your Honor.  As Your Honor recalls, in

2      the plea agreement itself, we agreed with the government that

3      Mrs. Bragg and Mrs. Hatfield were entitled to restitution, and

4      also agreed with the government that the appropriate measure for

5      that restitution would be the settlement in the civil case.  So,

6      if they choose in this proceeding not to file any statements, we

7      obviously don't have any objections, but do believe that the

8      resolution of that case, obviously to which they agreed and

9      which was approved by the court, should give this court

10     confidence that our responsibilities to them were appropriately

11     discharged through that civil settlement.

12          THE COURT:  Thank you.

13        Mr. Stanley, do I understand correctly that you are here

14     today --

15          MR. STANLEY:  Yes, Your Honor.

16          THE COURT:  -- for Ms. Hatfield?

17          MS. HATFIELD:  Yes.

18          THE COURT:  And I would ask you whether you have any

19     statement that you wish to make, or whether Mrs. Hatfield does,

20     both of you, for that matter; and if you do have a statement to

21     make, you are welcome to come forward.

22          MR. STANLEY:  Your Honor, I do have a statement to make

23     on behalf of the widows if I may approach.

24          THE COURT:  If you would, please.

25          MS. HATFIELD:  Your Honor, I won't be making a

```
 1  statement; Mr. Stanley will.

 2          THE COURT:  Thank you, ma'am.

 3          MS. HATFIELD:  Thank you.

 4          MR. STANLEY:  Your Honor --

 5          THE COURT:  Can I ask you a question first.

 6          MR. STANLEY:  Yes, sir.

 7          THE COURT:  Has Mr. Smith stated it correctly that

 8  Ms. Hatfield on behalf of herself and estate does not have a

 9  claim for restitution in this case?

10          MR. STANLEY:  He has, Your Honor.

11          THE COURT:  Thank you.

12      Do you represent the Bragg estate as well?

13          MR. STANLEY:  Yes, Your Honor.

14          THE COURT:  Is the same thing true with respect to the

15  Bragg estate?

16          MR. STANLEY:  Yes, it is, Your Honor, and I have a

17  short statement I would like to read into the record that

18  addresses the issue.

19          THE COURT:  So that would be true on behalf of both

20  Ms. Bragg and the estate of Mr. Bragg.

21          MR. STANLEY:  That is correct, Your Honor.

22          THE COURT:  Thank you.  And pardon me for interrupting

23  you.

24          MR. STANLEY:  That's quite all right, Your Honor.

25      Your Honor, the widow of Don Bragg, Ms. Delores Bragg, and
```

1    the widow of Elvis Hatfield, Ms. Freda Hatfield, have asked me
2    to offer a short statement on their behalf.  As I said, I am
3    Bruce Stanley, their attorney.  Ms. Bragg is here today.
4    Ms. Hatfield was unable to attend.

5        We have seen the presentencing memorandum submitted by
6    Aracoma's lawyers.  First, let me make clear that the widows,
7    both personally and in their capacity as administratrixes of
8    their dead husbands' estates, desire to maintain the confidence
9    of the terms of the settlement they reached following nearly
10   three years of litigation and a week of trial before a Logan
11   County jury.  They are not seeking restitution through these
12   proceedings.  But they certainly hope to dispel any notion that
13   such civil settlement came as a result of any remorse on the
14   part of Aracoma, Massey Energy, or Don Blankenship.

15       Indeed, two days after a settlement was achieved, the
16   following quotes were attributed to Massey's CEO, Don
17   Blankenship:  That Masseys lawyers had to, quote, measure the
18   potential outcomes and make a settlement based on business
19   rather than fairness.  That because of West Virginia's, quote,
20   very liberal system, quote, you have to take that into account
21   when you are in those situations.  That, quote, it's just a
22   mistake and people make mistakes.  Unfortunately, sometimes it's
23   bad.  That described Mr. Bragg and Mr. Hatfield as, quote, the
24   two that didn't, for whatever reason, get their mask on or panic
25   or whatever happened.  That the inspectors were just as

1    responsible as anyone at Massey.  Quote, we're the first line

2    responsibility there, but so, too, are state inspectors and

3    federal inspectors and so forth.

4        Indeed, the widows respectfully suggest that this honorable

5    court should review the findings of the Mine Safety and Health

6    Administration's internal investigation into this patently

7    avoidable crime before allowing a plea that lets Massey Energy

8    go scot-free.  The widows find it both frustrating and

9    fascinating that Aracoma, after three years of tenacious

10   engagement contesting civil liability, is now prepared to

11   readily admit criminally that which it so vehemently denied

12   civilly.  Apparently, the difference can be expressed as the

13   portion of insurance coverage availability.  Aracoma and Massey

14   apparently concluded that the running coverage dispute with

15   their carrier justified confrontation with the widows in open

16   court; these same widows that they now admit in writing are the

17   victims of their crimes.

18       Make no mistake, the decision by these women to not seek

19   restitution has nothing to do with any remorse on the part of

20   Aracoma or its human managers, most of whom were employed there

21   on the occasion of no less than three -- yes, three --

22   underground mine fires, only the last of which, the killer one,

23   was reported to authorities.  These same Aracoma managers are

24   presumably still under investigation by these same prosecutors.

25       These women are tired widows, and Aracoma made them that

1   way.  They simply request that this honorable court remember as
2   much when it makes its rulings.
3       And I can provide a copy of that to the court if you would
4   like, Your Honor.
5               THE COURT:  I would appreciate your doing so.
6               MR. STANLEY:  If I may approach.
7       Your Honor, I don't know if this is the appropriate time,
8   but I was given a card and note that was prepared by Mr. Bragg's
9   younger brother.  If the court would want me to go ahead and
10  make that statement on the record now, I can do so.
11              THE COURT:  Please do.
12              MR. STANLEY:  Your Honor, it's a card that is titled,
13  "To my brother, my friend," and it reads:  "We fussed and we
14  teased, we had fights and we had fun, and always in my heart I
15  knew that I would do anything for you.  We forged a bond that
16  time cannot erase, and we share a secret smile that the world
17  will never understand.  We grew up, but we never grew apart.  I
18  know how hard you worked and I see all the things you do for the
19  people you love.  What a wonderful person you have become.  You
20  can never know how proud I am to tell the world that's my
21  brother, but I am even prouder to say that's my friend."
22      And it carries a handwritten note that says, "Riz, I'm sorry
23  that I wasn't there when you needed me.  Now it feels like I'm
24  being punished every day.  It hurts that bad.  I stay mad at the
25  world now because I'll never see you again.  It's not fair, it's

1    not right, and I hate myself because I can't change that.  I

2    miss you.  I love you.  Your little brother, JJ."

3        Thank you, Your Honor.

4            THE COURT:  Thank you.

5        We'll be in recess for about five minutes.

6        (At 2:12 p.m. there was a recess until 2:21 p.m.)

7            THE COURT:  Please be seated.

8        With respect to the remaining claims that have been filed by

9    seven individuals, I understand counsel are present in the

10   person of Mr. Hrko and Mr. Bailey, and I would ask whether or

11   not the parties are ready to be heard on those matters.

12           MR. SMITH:  Your Honor, the United States is ready and

13   would like to make a short statement about those, if we may, to

14   begin.

15           THE COURT:  Please do.  Let me ask to have the

16   appearance of those who are appearing on behalf of those seven

17   individuals.

18           MR. HRKO:  Sam Hrko, Your Honor.

19           THE COURT:  Thank you.

20           MR. HRKO:  Mr. Bailey is not here.

21           THE COURT:  Thank you.

22           MR. SMITH:  There may actually be eight as well, if we

23   count Jonah Rose.

24           MR. HRKO:  Correct, Your Honor.

25           THE COURT:  And, Mr. Hrko, you represent him as well?

1              MR. HRKO:  Correct.

2              THE COURT:  And what did we finally decide on Johnny

3     Brown?

4              MR. SMITH:  Mr. Brown told the court that he, through

5     his counsel, Tonya Hatfield, that he did not seek restitution in

6     this matter.

7              THE COURT:  Very good.

8         And so, if we might hear about the remaining eight.

9              MR. SMITH:  Your Honor, Mr. Hrko has provided

10    substantial materials, including the reports of examinations by

11    medical professionals regarding these eight individuals, and

12    nothing that we say here today, Your Honor, would deny that

13    these men have been profoundly affected by the fire.

14        We believe, having reviewed the material very carefully,

15    that they are not eligible for restitution under the statute

16    because of the failure to show a bodily injury as required by

17    the statute.  We certainly don't dispute the fact that these men

18    have suffered and are suffering, but we don't believe they fall

19    within the reach of the statute that requires as a threshold

20    bodily injury.

21        We can discuss more details about that, but that is, in

22    short, the position of the United States, Your Honor.

23             THE COURT:  Have you had occasion to have any

24    conversation with counsel for those eight individuals as to the

25    applicable law?

1          MR. SMITH:  Yes, Your Honor, we have.  The specific

2    narrow issue is whether there is bodily injury resulting from

3    some smoke inhalation, and the position of the United States,

4    again, we came to this kind of reluctantly, but the position is

5    the materials provided really don't show that there is

6    sufficient -- or that there is a qualifying bodily injury to

7    make them entitled to restitution.  Mr. Hrko and I have

8    discussed on a number of occasions this issue, both factually

9    and legally, and I believe he is conversant in the issue.  He

10   knows what the issue is there.  And I have advised him that we

11   intended to make this position known to the court at this time.

12   Again, it's not denying the profound affect of this on these men

13   and many others, but it is an application of the statute that

14   Congress gave us to work with here.

15          THE COURT:  Thank you.

16      With that introductory statement, I don't know whether to

17   turn next to Mr. Hrko or Mr. Luskin, but, Mr. Hrko, would you

18   like to be heard at this point?

19          MR. HRKO:  I would like to be heard, judge, whenever

20   you want to hear me.

21          THE COURT:  Please come on up.

22          MR. HRKO:  Thank you, judge, for hearing me.

23      I was at the plea hearing, and the court inquired of the

24   United States Attorney's Office as to any other potential

25   victims.  The court directed Mr. Smith to inquire as to other

1  victims.  That next day, I think, I either called or sent

2  Mr. Smith a letter, and we've been in contact with each other

3  since.

4      My clients were given the opportunity to present victim

5  impact statements, and they chose to do so.  What we decided to

6  do was to attach certain pieces of discovery that had been

7  produced in our civil action, which is currently pending in

8  Logan County, to the victim impact statements and rely upon

9  that.  We attached two medical exams, one by an M.D., one by a

10  Ph.D., regarding psychological issues.  We produced an economic

11  report and we produced a vocational report.

12      What we haven't produced is any medical evidence, any

13  medical records or any deposition testimony because, quite

14  frankly, we don't have any deposition testimony at this point,

15  regarding what impact this fire had upon my clients.  As far as

16  the legal issue regarding how physical injury is defined in the

17  United States Code, I have had several conversations with

18  Mr. Smith.  I have reviewed the sentencing memorandum, which

19  actually was not served on me, but I found, through independent

20  sources, I reviewed it briefly today before the hearing.

21      I guess the only thing left to say is with respect to

22  whether or not there was a physical injury, we feel it would be

23  better for a jury in Logan County to hear all the evidence, to

24  hear how the fire impacted these eight individuals, and let them

25  make that determination.  And while I'm not standing here saying

1    we're withdrawing or we're pulling back, I guess my point is,

2    Your Honor, we submitted statements to you as evidence of the

3    impact.  And, to tell you the truth, that was done before there

4    was a physical injury, any discussion on my part with the United

5    States Attorney regarding the physical injury issue.

6        While granted, the psychological issue is a huge part of our

7    civil action below, I don't think anyone can go through a fire

8    without having some physical injury.  They breathe the contents

9    of the fire.  They are -- we are in the process of scheduling

10   medical examinations in Pittsburgh by Aracoma's expert, Dr. Feno

11   (phonetic), to do what I suppose will be pulmonary function

12   tests.

13       And just to wrap up, judge, I think all those issues -- I

14   think Aracoma is correct.  All those issues will involve a lot

15   of discovery, a lot of evidence, and that's -- that's what the

16   civil case is about.  And if there's any other questions from

17   the court, I guess the only thing I would want to leave the

18   court with is based upon what we have provided Your Honor, our

19   claims may not rise to physical injury, but I don't want to

20   waive them, and ask the court to make no finding with respect to

21   that beyond what evidence has been presented.

22          THE COURT:  The court's findings will necessarily be

23   based upon that which is before it, and I believe that you are

24   conceding that that which is before the court at this juncture

25   is limited to psychological impairment.

1          MR. HRKO:  Correct.

2          THE COURT:  And perhaps you are conceding as well that

3    if that's all there is, and it is much, I would readily

4    acknowledge, but if it is that rather than bodily injury or

5    associated with bodily injury, do I take it that you concede

6    that it's not compensable in this proceeding as distinguished

7    from the Logan County proceeding?

8          MR. HRKO:  Correct.  I guess we reserve the right to

9    present that evidence to the court, the Circuit Court of West

10   Virginia.

11         THE COURT:  I see.  I gather then that the claims at

12   this juncture in this court are limited to psychological injury

13   as distinguished from bodily injury.

14         MR. HRKO:  Correct.

15         THE COURT:  And if that were the case, it would be the

16   court's expectation that it would not be the subject of

17   restitution in this matter which I take it is what you

18   anticipate.

19         MR. HRKO:  After having conversations with Mr. Smith,

20   you are correct, judge, I anticipated that -- that finding.

21         THE COURT:  Very good.  I thank you for the

22   presentation.

23         MR. HRKO:  Thank you, judge.

24         THE COURT:  And I gather that you are speaking on

25   behalf of all eight of those individuals that we've earlier

1   identified.

2        MR. HRKO:  Correct.  Would you like me to list those

3   eight for the record?

4        THE COURT:  It might be a good idea.

5        MR. HRKO:  Joseph Hunt, Steve Hensley, Harold Shull,

6   Patrick Kinser, Thomas Vanover, Gary Baisden, Randall Crouse,

7   and Jonah Rose.

8        THE COURT:  Thank you.  I think those names all comport

9   with the materials we already have, that is, including Mr. Rose,

10   and that being the case, the court so understands.

11        MR. HRKO:  Thank you, judge.

12        THE COURT:  Thank you very much.

13        MR. HRKO:  Thank you.

14        THE COURT:  Is there anyone else here on behalf of any

15   of those eight individuals?

16     I take it there is no one else.

17     And in light of that which has been stated, Mr. Luskin, have

18   you any comment?

19        MR. LUSKIN:  Just two things to add, Your Honor.

20     First, I certainly agree with both Mr. Smith and Mr. Hrko,

21   that there is not evidence before the court of bodily injury;

22   and as the court is well aware, bodily injury is a statutory

23   requirement before restitution may be ordered.

24     I also agree with Mr. Hrko that to the extent that there may

25   in theory be any compensable injuries, as opposed to injury that

 1   is subject to restitution as part of this sentencing, that it is

 2   better subject to determination in the parallel civil proceeding

 3   pending in Logan County.

 4        I would add only that we also reviewed for the first time

 5   this afternoon the statement filed by Jammie Adkins, who is not

 6   represented by Mr. Hrko, but a review of his statement makes

 7   clear that he claims to be suffering from anxiety and depression

 8   arising from the events in January of 2006, and that his victim

 9   impact statement also does not allege anything other than

10   psychological injuries.  Therefore, not injuries subject to

11   restitution under the terms of the statute.

12             THE COURT:  Thank you.

13        Mr. Smith.

14             MR. SMITH:  Your Honor, again, acknowledging the very

15   real problems alleged by Mr. Adkins, we agree that his claim

16   does not include any allegation of bodily injury; and without

17   that, the statute doesn't allow the court to order restitution

18   for him in this proceeding, and we think the court should not do

19   that for that reason.

20             THE COURT:  Thank you.

21        Just a moment.

22        Ms. Cueva, we want to be sure we're straightened out on

23   this.  Do you have a victim impact statement on behalf of

24   Mr. Rose and which you may have, and do you have one on behalf

25   of Mr. Baisden which you may not have?

1          THE PROBATION OFFICER:  May I check my records?

2          THE COURT:  Thank you.

3          THE PROBATION OFFICER:  I have a statement from

4    Mr. Rose.  The other?

5          THE COURT:  Mr. Baisden.

6          THE PROBATION OFFICER:  I do not have a victim impact

7    statement from Mr. Baisden.

8          THE COURT:  Thank you.

9      Mr. Hrko, we have seven that include Mr. Rose, but it

10   doesn't include Mr. Baisden, and I wonder whether it has in fact

11   been filed with anyone.

12          MR. SMITH:  Your Honor, I have it, and, again, if

13   Ms. Cueva doesn't have it, then it's my failure and I apologize

14   for that.  It is -- it was addressed by Mr. Hrko and I believe

15   accurately.  I apologize, but I do have it.  I have it in my

16   hands here.

17          THE COURT:  All right.  I'm going to call on Mr. Hrko,

18   though, at this juncture to ask him.  These are lengthy

19   statements.  The court has been through them.  I have not seen

20   Mr. Baisden's statement.  Would I be correct in understanding

21   that it's drawn in the same language with the same support as

22   the other seven were?

23          MR. HRKO:  That would be accurate, Your Honor.

24          THE COURT:  Purely psychological injury shown.

25          MR. HRKO:  Correct.

1              THE COURT:  Thank you.

2              MR. HRKO:  And, Your Honor, can I just say one more

3   thing?

4              THE COURT:  Go ahead.

5              MR. HRKO:  This was brought up earlier.  If any of

6   these statements are filed on behalf of the eight individuals, I

7   would ask that they be filed under seal.

8              THE COURT:  The court may choose to leave them in the

9   hands of either the United States Attorney or the United States

10  Probation Officer, or both, without filing on the public record.

11  And at the moment I don't see any need for doing otherwise

12  because there seems to be no issue that needs to be resolved

13  regarding them.  The matter has been conceded, as I understand

14  it, as a matter of law here at this hearing today.  And if

15  that's a correct understanding, I believe we can leave them all

16  in that posture.

17             MR. SMITH:  The United States would -- we think that's

18  the right thing to do, Your Honor.

19             THE COURT:  All right.

20             MR. LUSKIN:  Your Honor, we concur.

21             THE COURT:  Mr. Hrko, do you agree?

22             MR. HRKO:  I can agree to that, judge.

23             THE COURT:  Very good.  Then we'll leave it at that.

24  And because we're treating those in that fashion, we'll do the

25  same with Mr. Adkins, and I believe that covers the matter in

1    its entirety insofar as restitution is concerned.  As I

2    understand it, based on the results of the hearing today, there

3    is no restitution to be ordered.

4              MR. SMITH:  That's correct, Your Honor.

5              MR. LUSKIN:  Yes, sir.

6              THE COURT:  Thank you.

7         And, Mr. Hrko, you need not remain further.  You and

8    Ms. Hatfield are both welcome to remain if you wish to do so,

9    but in view of these developments, I think that there will be no

10   further factor involved that will affect you.

11        As to Tonya Hatfield, it may be as to your client, if the

12   court were for any reason to determine that this matter should

13   be continued, I would give you that additional time in which to

14   file something if you wish to do it; and so, that's about the

15   only reason I can see that you may wish to remain, but you may

16   wish to do so for other reasons, you are welcome to stay.

17             MS. HATFIELD:  Thank you, Your Honor.

18             THE COURT:  Let me ask counsel about a matter that was

19   raised by Mr. Stanley in which he says that Ms. Bragg and

20   Ms. Hatfield suggest that the court should review the findings

21   of the Mine Safety and Health Administration's internal

22   investigation.  What is the status of that matter?  The court

23   believes that the administrative law judge made findings and

24   that perhaps the commission for the Mine Safety and Health

25   Administration has perhaps undertaken to review that matter.

1    What is the status?

2           MR. SMITH:  Your Honor, I believe we're talking about

3    two separate things.

4           MR. HEATH:  Yes.

5           MR. SMITH:  There was an internal review conducted by

6    the Mine Safety Health Administration, and some time ago, it

7    released a public report regarding the performance of the Mine

8    Safety and Health Administration in inspecting the Aracoma No. 1

9    mine prior to the fire in January of '06.  That's a public

10   report.  It has been released and it is a public document, and

11   it makes some findings about the performance of the agency in --

12   in ensuring the safety of these mines.

13          THE COURT:  Well, let me interrupt and ask.  Is that

14   the report, rather than the administrative law judge's report,

15   that you are referring to, Mr. Stanley?

16          MR. STANLEY:  That particular report was -- that we're

17   referring to is the one that Mr. Smith has referenced, Your

18   Honor.

19          THE COURT:  Yes.

20          MR. STANLEY:  It was a report that was prepared by

21   investigators.  What the status or follow-up of that report with

22   regard to any criminal investigation or --

23          THE COURT:  I think in this case, a civil fine.

24          MR. STANLEY:  I -- I don't think that's related to the

25   ALJ matter, Your Honor.  I think they are separate issues.

1          MR. LUSKIN:  Your Honor, if I can clarify.

2          THE COURT:  Thank you.

3          MR. LUSKIN:  The report to which Mr. Smith and

4   Mr. Stanley are referring was an internal report by MSHA into

5   its own conduct, and there may be consequences that they relate

6   to the performance of MSHA.  That was an investigator's report,

7   not a report or an opinion by an administrative law judge as a

8   result of any contested proceedings.  The civil proceedings by

9   MSHA against Aracoma, as Your Honor knows, were concluded in a

10  parallel civil disposition that was accomplished at the same

11  time as the plea agreement resolving this case, and that matter

12  which involved the payment of a fine -- a civil fine of 1.7

13  million dollars has been concluded.  If you have any more

14  questions about the status of that proceeding, Mr. Heath, who

15  represented Aracoma in that matter, is present and can answer

16  those questions.

17         THE COURT:  Yes.  While we're on the subject, I have

18  the general understanding that perhaps a supervisory commission

19  may have taken that under review, that is, the decision of the

20  ALJ --

21         MR. HEATH:  Yes, sir, if I may --

22         THE COURT:  -- which I believe perhaps is one that is

23  reviewed, as other administrative appeals often are, on a

24  substantial evidence basis.

25         MR. HEATH:  Your Honor, actually it's a question of law

1    before them.  The commission -- the ALJ approved the settlement,

2    including the 1.7 million dollar payment which has been made by

3    Aracoma.  The next level above the administrative law judge is

4    the Federal Mine Safety Health and Review Commission.  It has

5    power on its own to review decisions, if it wishes, and it

6    looked and said it wanted to review only that part of the

7    decision that related to an S&S reduction plan and how --

8            THE COURT:  Related to what again?

9            MR. HEATH:  I'm sorry.  In the settlement agreement,

10   there was something called an S&S reduction plan.  It was a plan

11   that the mine came up with to help reduce the number of

12   violations rated significant and substantial, and it ties in to

13   another part of MSHA called pattern of violations.  It was

14   separate from the dollar amounts related to the penalties.  We

15   have actually paid the 1.7 million dollars.  That part of the

16   case is final and not subject to review.  The only thing the

17   commission asked to look at was whether or not an S&S reduction

18   plan could be done outside of the pattern of violation process.

19   So it's a technical question.  It has been briefed with a joint

20   brief by MSHA and Aracoma on April 3rd.  It is awaiting decision

21   by the commission.

22           THE COURT:  The S&S reduction plan --

23           MR. HEATH:  Yes, sir.

24           THE COURT:  -- is one that was generated by whom?

25           MR. HEATH:  By Aracoma.  It was submitted to District

1  4, the MSHA office, as a procedure to reduce the number of

2  violations rated S&S at the mine.

3          THE COURT:  Was it done because Aracoma was directed to

4  produce some such plan?

5          MR. HEATH:  It was Aracoma's option to do so, and they

6  chose to do it.  It relates to the fact that there was a large

7  number of violations being settled at once, so they would have

8  hit the history of the mine all in one quarter which could have

9  resulted in a pattern of violation proceeding starting.  So this

10  was a way to allow the mine to get its compliance history back

11  in line and also work to reduce those S&S violations.

12          THE COURT:  That's the only phase of it then that is on

13  appeal.

14          MR. HEATH:  Yes, sir, that's correct.

15          THE COURT:  Thank you.

16     Mr. Smith, do you understand it any differently?

17          MR. SMITH:  No.  That's how we understand it, Your

18  Honor.

19          THE COURT:  And, Mr. Stanley, do you understand it any

20  differently?

21          MR. STANLEY:  Not with regard to that particular issue,

22  Your Honor.  That was not the reference I was making in my

23  statement.

24          THE COURT:  I understand, but now that we have

25  categorized the two, let me ask you.  What is there about the

1   findings of the Mine Safety and Health Administration's internal

2   investigation that you believe would be helpful in this matter?

3   I take it, first of all, you have reviewed the report --

4           MR. STANLEY:  I have, Your Honor.

5           THE COURT:  -- on that matter.

6           MR. STANLEY:  Yes, I have, Your Honor.  Would Your

7   Honor want me to approach?

8           THE COURT:  Is it the report that you are suggesting

9   that the court review?

10          MR. STANLEY:  Yes, Your Honor, the publicly available

11  report, what we would suggest the court may want to focus upon.

12  Again, Your Honor, this issue I have raised is as a result of

13  our understanding that with the plea that has been entered, that

14  the United States Government will not look beyond the operating

15  subsidiary Aracoma in any further criminal investigation

16  associated with this mine fire.  What we -- and that as a

17  result, that the parent corporation or other superior or senior

18  subsidiaries, such as A.T. Massey Coal Company or the parent

19  Massey Energy Company, could not be held liable in any event for

20  further criminal proceedings.  What we would suggest --

21          THE COURT:  Now, can I interrupt you and ask.

22          MR. STANLEY:  That's okay.

23          THE COURT:  The determination by whom that they could

24  not be held liable?  Simply because that's the terms of the plea

25  agreement or it arises from something else?

1           MR. STANLEY:  It arises from our understanding of the

2    plea agreement.

3           THE COURT:  All right.

4           MR. STANLEY:  And that we would suggest simply that a

5    review of this -- of this publicly available report would

6    intimate that palpable pressure was placed upon MSHA District 4

7    personnel to alter the -- the assignment of inspectors for this

8    particular mine; and that it was after such assignment, that a,

9    for want of a better term, equivalent cessation of violations

10   were found at this particular mine.  When MSHA went in after the

11   fire, of course, a host, a multitude of obvious violations were

12   noted by the investigating team.  And it is our concern that

13   that pressure upon MSHA may have come from Massey personnel

14   above the Aracoma chain of command.

15          THE COURT:  That is something that would have taken

16   place before the events of January 19, 2006.

17          MR. STANLEY:  That is correct, Your Honor.  And I think

18   the publicly available report does a fairly good job of laying

19   out the chronology of the events associated with these

20   inspection assignments and the -- the change in the rate of

21   citations issued to this particular mine.

22          THE COURT:  In that report, are either of the two fires

23   that took place in December of 2005 mentioned?

24          MR. STANLEY:  I think there may have been passing

25   reference, Your Honor, but I would ask the court not to hold me

1   to that, only because there are multiple reports out there where

2   those fires were mentioned, and I wouldn't want to confuse the

3   court by representing one report.  And, unfortunately, I did not

4   think to bring with me today a copy of the internal

5   investigation that I referenced in the statement.  I should

6   have, Your Honor, and I apologize for that.

7           THE COURT:  But, once again, you are referring to the

8   same thing, and that's the report that is a matter of public

9   record.

10          MR. STANLEY:  It is.

11          THE COURT:  Thank you.

12          MR. STANLEY:  Thank you, Your Honor.

13          THE COURT:  Let me ask counsel if you wish to elaborate

14  on that matter.

15          MR. SMITH:  Let me just note that the report was

16  released in June of 2007, Your Honor.  We had the benefit of

17  that report in our investigation and prosecution in this case.

18  And, again, I want to make sure it's properly characterized.  It

19  is the review by the Department of Labor of its own agency to

20  determine its performance and effectiveness in the inspections

21  in the period leading up to the January 19, 2006, fire.  It is

22  about 180 pages, plus executive summary and attachments.  It's a

23  lengthy, comprehensive, and pretty, if I may say, bare-knuckled

24  look at its own agency, and my opinion probably has little

25  relevance in the criminal case right now.

1       I understand Mr. Stanley's point, but that leads into the

2    question of why we have reached the plea agreement that we have,

3    and I'm prepared to address that at the appropriate time.  I

4    think the court has enough information, without reviewing the

5    report, to decide whether to accept or reject the plea

6    agreement.  But we have the report.  I can't recall whether we

7    gave it to Ms. Cueva or not.  We may have had a digital copy

8    that we gave her, but it's an extensive report on the --

9    frankly, the, you know, the problems with inspection of this

10   mine prior to the fire in January of '06.

11           THE COURT:  I gather from what has been said is that

12   the report has to do with an internal investigation of MSHA, in

13   particular, its inspectors, and it is focused on the Aracoma

14   mine and that which occurred on January 19th.  Would I be

15   correct in that?

16           MR. SMITH:  With what occurred on the 19th and leading

17   up to the 19th, yes, Your Honor.  It reaches back I think even

18   more than one quarter.  I think it reaches back for some period

19   beyond just a few quarters.

20           THE COURT:  Beyond the last quarter of 2005, you are

21   saying?

22           MR. SMITH:  Yes, Your Honor.

23           THE COURT:  Thank you.

24       Mr. Luskin, what's your take on that?

25           MR. LUSKIN:  I concur with Mr. Smith, that I don't

1  think that the report needs to become part of this sentencing

2  process; and would add, Your Honor, that while it raises

3  questions about the conduct of MSHA, it certainly does not lay

4  out any evidence whatsoever that any failures by MSHA were

5  somehow improperly caused by either individuals or entities who

6  are the beneficiaries of the nonprosecution provisions in the

7  plea agreement.  That is speculation on Mr. Stanley's part.

8  There is nothing in the report that would suggest that.

9      And, of course, I am more than happy at the appropriate time

10  to talk about the nonprosecution provision because, of course,

11  Your Honor has not yet accepted the plea agreement.  But I will

12  say as to this particular matter, and as to every other matter

13  related to the negotiations of the nonprosecution provisions, my

14  agreement with Mr. Smith followed the evidence, it did not

15  contradict it, and those provisions were negotiated and

16  included, only after we had gone through a very exhaustive

17  process of reviewing all of the evidence, not simply this MSHA

18  report, but obviously everything else that was produced by

19  Aracoma in the context of the grand jury investigation and the

20  civil investigation and other information that Mr. Smith had

21  acquired, and it was our view that the nonprosecution agreements

22  were appropriate precisely because there was not substantial

23  evidence that would indicate that other individuals or entities

24  outside of Aracoma should be prosecuted.

25          THE COURT:  Thank you.

1        That I believe leads us to the question of the

2   nonprosecution agreement with respect to those other than

3   Aracoma and its officers and employees.  Is the government

4   agreeing to nonprosecution because it can't make a case against

5   any of those individuals that it agrees not to prosecute or any

6   of those entities it agrees not to prosecute?

7            MR. SMITH:  Yes, Your Honor.

8            THE COURT:  And I take it that that being the case, if

9   this agreement were not accepted with that provision in it, that

10  the government would remain of the mind that there was no basis

11  for prosecuting any of these named entities and individuals,

12  other than Aracoma and its employees and officers.

13           MR. SMITH:  Yes, Your Honor.

14           THE COURT:  Thank you.

15     Let me ask the parties whether or not you have anything

16  further on that matter.

17           MR. SMITH:  No, Your Honor.  Thank you.

18           THE COURT:  Let me ask whether or not, Mr. Luskin, you

19  have anything to add with respect to why this court should

20  approve this plea agreement.

21     I am going to mention a thing or two to you to begin with,

22  and it is this.  First of all, the remedy by way of fine as the

23  criminal sanction in the case is the foremost weapon that one

24  would have in the hands of the court to punish the conduct.  It

25  looks to me as though the fine that has been agreed upon at 2.5

1   million dollars is within 100,000 dollars of the maximum that

2   the court could in any event impose.

3           MR. LUSKIN:  That is correct.

4           THE COURT:  Is that a correct understanding?

5           MR. LUSKIN:  Yes, sir, that is correct.

6           THE COURT:  Does the government agree with that?

7           MR. SMITH:  Yes, we do, Your Honor.

8           THE COURT:  Other than that, the question is the extent

9   of probation and what conditions might be employed with respect

10  to probation, although probation itself is of limited value if

11  the penalty that may be imposed has already been exhausted.  It

12  does seem to me that it has the refreshing prospect of

13  disclosure in the event there is a failure of compliance with

14  the court's conditions, but beyond that, it would not seem that

15  there is much for a court in the future to do if the conditions

16  of probation were violated.  And I wonder whether or not counsel

17  have any different view of the matter.

18          MR. LUSKIN:  No, sir, I think not.  Traditionally,

19  probation serves three purposes:  To ensure the payment of a

20  fine, and as Your Honor knows in this instance, the fine was

21  paid at the time that the plea was entered; to ensure

22  satisfaction of restitution obligations, and there appear to be

23  none; and, finally, to impose conditions that will deter

24  potential future violations, and as Your Honor knows from the

25  material that we provided with our sentencing memorandum and to

1   Ms. Cueva, the company is taking extraordinary steps in the wake

2   of this tragedy to ensure not only that this type of accident

3   but others, similar accidents, don't happen again.  And the

4   proof of the pudding really is in the record of the mine since

5   then.

6       As Your Honor knows, in 2007, the year following the

7   accident, the mine worked almost 600,000 man-hours and produced

8   over a million tons of coal, without a single nonfatal day lost;

9   and as a general matter, since the accident, the level of

10  nonfatal days lost by this mine are about one-third the level

11  from MSHA data that are found in mines of this type.  And the

12  mine has received awards both from the Massey company for its

13  safety performance, but more importantly from the Home Safety

14  Foundation which includes representatives of MSHA, and state and

15  local mine safety organizations, for its accomplishments.

16      This is not a case like the typical case where the defendant

17  stands before the court and promises to do better, where the

18  court has no assurance, based on the conduct that has taken

19  place since the offense, that those are not mere empty words.

20  In this instance, the passage of more than three years since the

21  accident gives the court an ample record to review to learn

22  whether or not those promises to do better were simply promises

23  or whether they were more than that.  And we submit that the

24  efforts by the mine to turn around its operations and to deal

25  with the ugly fact that, as Mr. Stanley put it, this was an

1     avoidable accident, an avoidable tragedy, and to assure

2     themselves as much as one can in a dangerous business, that they

3     are not going to be repeated.

4          And under those circumstances, Your Honor, I don't believe

5     that a heavy hand of probation is necessary in order to assure

6     the court that this type of conduct won't be repeated.

7               THE COURT:  Thank you.

8               MR. SMITH:  Your Honor, in this particular case, the

9     offense conduct is fairly wide-ranging and covers a variety of

10    failures in this mine, from escapeway existence to escapeway

11    drills, to training, to the meaning of evacuation, to accurate

12    and honest records.  It would be I think extremely difficult for

13    the court to try to address those failings in conditions of

14    probation.  The mine has changed since the fire.  Whether it's

15    as Mr. Luskin represents or not, we're not really in a position

16    to know and to say.  We hope, the United States hopes, my office

17    hopes that the assurance of safety in this mine is going to come

18    from proper enforcement by the Mine Safety and Health

19    Administration, from the agency charged with that, and that is I

20    think realistically going forward the avenue to get to and to

21    ensure the safety of this mine.

22         We have very little suggestions for the court as to the

23    value of a term of probation here.  You know, the court has in

24    simpler and earlier cases I think imposed a term of probation,

25    with some specific conditions directed to the harm that it saw

1    in the case.  I'm not sure the court can do that here.  As the

2    court knows, the main weapon we have here is the fine, and it

3    may very well be that probation, which is not mandatory in this

4    case, is not necessary.  I'm not sure it would serve any of our

5    needs.

6              THE COURT:  Thank you.

7         Anything further on that matter as to the court's

8    determination as to whether to accept the plea agreement?

9              MR. LUSKIN:  No, sir, not on behalf of Aracoma, sir.

10             MR. SMITH:  Your Honor, we do ask you to accept it.

11   It -- it is a good agreement given our investigations, and we

12   believe that it fairly represents the serious nature of the

13   conduct which is at issue here.  We believe that we haven't

14   given up any single case that we could prove, and we believe

15   that we are going forward with other matters involving the fire,

16   but there is no evidence of any viable case outside the scope of

17   what this agreement allows us to pursue.

18        The reason for that, Your Honor, is, as the court knows, we

19   really have just two statutes to work with, a false statement

20   and a violation of the mandatory safety standard.  Both require

21   specific knowing, intentional action, and that lets us make that

22   determination of where we have a viable case with pretty good

23   certainty.  This -- this conduct was serious, but it was in the

24   opinion of the investigators and my office contained in the mine

25   and its management itself, and whether it was affected by

1    outside policy and influences can be argued, but it will never

2    rise to a criminal case of knowing and intentional action in

3    violation of one of those statutes.

4         So, we ask the court to accept the agreement.

5              THE COURT:  Thank you, Mr. Smith.

6         Anything further on that matter, Mr. Luskin?

7              MR. LUSKIN:  To add only this, Your Honor, to what

8    Mr. Smith said, and that is that, of course, we have cooperated

9    in the investigation since the beginning as the plea agreement

10   reflects and the presentence report reflects, and we have a

11   continuing obligation under the presentence report to cooperate

12   with the government.  And so, the court can have some confidence

13   that Mr. Smith's representations about where the evidence leads

14   and the agreement which is reflected in the plea agreement is

15   the product of full cooperation on the part of Aracoma in

16   disclosing what it knows about how this tragedy occurred.

17             THE COURT:  Thank you.

18        We'll be in recess for ten minutes.

19        (At 3:05 p.m. there was a recess until 3:35 p.m.)

20             THE COURT:  Please be seated.

21        Let me ask with respect to the presentence report,

22   Mr. Luskin, is the presentence report in all respects factually

23   correct?

24             MR. LUSKIN:  Yes, sir, it is.

25             THE COURT:  And is it correct otherwise as well?

1            MR. LUSKIN:  Yes, sir.

2            THE COURT:  And, Mr. Smith, is this report in all

3    respects factually correct?

4            MR. SMITH:  Yes, Your Honor.

5            THE COURT:  And correct otherwise?

6            MR. SMITH:  Yes, Your Honor.

7            THE COURT:  Thank you.

8        The court finds that Aracoma has accepted responsibility for

9    its failures that have led to these convictions.  As noted in

10   the presentence report, in the months and years following the

11   fatal fire at the Alma No. 1 mine in January 2006, Aracoma has

12   installed state-of-the-art fire suppression systems, has

13   developed and implemented enhanced firefighting measures and

14   technologies, has provided training and technologies for

15   emergency mine evacuation and mine rescue, and has made other

16   changes to ensure the safety of its employees.

17       Aracoma has implemented significant remedial and

18   preventative measures following the January 2006 fire, including

19   retraining of its dispatchers and EMS operators.  The company

20   has installed new fire suppression systems, new fire hoses with

21   permanent water connection, and improved access.  All Aracoma

22   belt examiners have been retrained, and all employees have been

23   retrained on the requirements of the mine's emergency and

24   evacuation firefighting plan, including conducting frequent and

25   compliant emergency evacuation escape drills.

1      Before and after the January 19, 2006, fire, Aracoma was

2   subject to the safety and ethics standards of Massey Energy

3   Company's, quote, Safety is Job First, unquote, program, whereby

4   employees are held to specific safety requirements that exceed

5   federal and state regulations.  That program was developed to

6   prevent and detect unsafe conduct and criminal violations, as

7   well, for that matter, of federal and safety mine -- I should

8   say federal and state safety mine regulations.  That program

9   includes binding employee safety commitment agreements and

10   ethics commitment agreements.

11      Aracoma, however, failed to comply with numerous mandatory

12   safety standards that are the subject of the several offenses

13   set forth in the ten counts to which Aracoma has pled guilty.

14   In particular, the court notes that the removal of the two

15   stoppings that destroyed the effect of the separation of the No.

16   2 section primary escapeway from the belt haulage entry that

17   contained the No. 9 longwall belt line went uncorrected by

18   Aracoma, even after two fires in December of 2005 should have

19   emphasized the inherent danger in the continuing failure to

20   correct that problem.  One of those stoppings was removed in

21   order to accommodate a splitter box in late October 2005 and in

22   late November 2005.  Another one was removed in order to

23   accommodate an overheating problem with respect to electrical

24   equipment due to an installation then taking place.

25      It is simply inexcusable that those two stoppings would have

1    been removed and not quickly replaced, and particularly to have

2    allowed the condition to continue for such a lengthy period of

3    time until the fire on January 19, 2006.  In that respect, the

4    court notes that Aracoma has recognized that it recklessly

5    failed to replace those stoppings, or, in the alternative, to

6    provide additional ventilation controls to restore the

7    separation of the No. 2 section primary escapeway from the No. 9

8    longwall belt haulage.

9        When the fire broke out on January 19, 2006, because of the

10   removal of the two stoppings, heavy smoke from the fire in the

11   No. 9 longwall belt line unit poured into the No. 2 working

12   section's primary escapeway.  That would in due course doom two

13   of the workers in that No. 2 section to a tragic death.

14   Fortunately, the other ten members of the No. 2 section were

15   able to escape.  Compounding the problem was the lack of water

16   to put out the fire.

17       The men on the scene in the No. 9 longwall belt line area

18   exhausted the fire extinguishers that were available, but when

19   they went to connect the fire hose, they find that the coupling

20   would not fit the valve; and then when they attempted to use the

21   water valve as a means of directing water onto the fire, they

22   found that there was no flow of water.  That was because the

23   shut-off valves someplace earlier in the water line system had

24   precluded the availability of water for that or any other

25   purpose.

1      At the same time, further complicating the circumstance was

2   the lack of training of a new dispatcher, who, upon first

3   learning of the fire, ought to have directed the men to

4   evacuate, that is, those at the No. 2 working section would not

5   immediately be aware of the fire that was taking place in the

6   No. 9 longwall belt line.  That was not done when communication

7   was had from the scene to the dispatcher of burning embers, and

8   it was not done soon after that when the carbon monoxide alarm

9   sounded, not once, but twice, so that the men in the No. 2

10  section were not contacted soon enough to get out unscathed.

11     The combination of those failures are simply inexcusable and

12  shows a lack of concern at the time with the safety and welfare

13  of the miners.

14     The court notes nevertheless that the plea agreement has

15  called Aracoma to account.  Each of those matters to which I've

16  referred, and several others as well, are the subject of the

17  guilty plea in this case.  The government, in the course of

18  reaching agreement with Aracoma, has agreed as well to another

19  condition that is an unusual one, and that is, the government

20  has agreed to nonprosecution of other entities named in the plea

21  agreement other than Aracoma and its employees and officers.

22     The court has learned first from Mr. Stanley today of the

23  existence of the MSHA report and what value and impact it may

24  have.  The court has also heard from the government, which has

25  considered that report, and has informed the court that after

1   taking into account that which is in the report itself, the

2   government does not have a case to make against those

3   individuals who are the subject of the nonprosecution agreement,

4   as well as those entities that are the subject of that agreement

5   as well.  It is, of course, for the executive to institute

6   investigations and prosecutions.  The government informs the

7   court that it lacks a case in that respect, and the court

8   accepts the government at its word.  It is again the entity that

9   is charged with that responsibility.

10      Because the government has in effect informed the court that

11  it is giving up nothing by agreeing to the nonprosecution

12  provision, the court has concluded that, in as much further as

13  the agreement calls for a near maximum penalty of a fine of 2

14  1/2 million dollars, which is in addition to the civil penalty

15  of 1.7 million dollars, that the agreement is fair and in the

16  interests of the defendant and the public.  And, accordingly,

17  the court has concluded to accept the plea agreement, and to

18  proceed to the sentencing of the defendant under its terms which

19  are binding on the court as has earlier been noted; that is,

20  once accepted.

21      Let me ask the parties whether or not you have anything

22  further at this time.

23          MR. SMITH:  No, Your Honor.  Thank you.

24          MR. LUSKIN:  No, Your Honor.

25          THE COURT:  Let me ask whether, Mr. Luskin, you have

1    anything you'd wish to say in behalf of the defendant before the
2    court imposes sentence.
3              MR. LUSKIN:  No, Your Honor.  I think you've given us
4    the opportunity to say everything that is relevant.
5              THE COURT:  And let me ask, Mr. Smith, whether or not
6    the government has any comment.
7              MR. SMITH:  Nothing further, Your Honor.  Thank you.
8              THE COURT:  And with that, do you see any reason why
9    sentence should not now be imposed in this matter, Mr. Luskin?
10             MR. LUSKIN:  No, sir.
11             THE COURT:  And do you see any reason why sentence
12   should not now be imposed, Mr. Smith?
13             MR. SMITH:  No, Your Honor.
14             THE COURT:  The court imposes a sentence in accordance
15   with the plea agreement, and directs the payment of the 2 1/2
16   million dollar fine that is applied to the various counts as set
17   forth in the plea agreement, which sum has already been paid.
18   The court similarly imposes a -- or, rather, an assessment of
19   1525 dollars under paragraph 4 of the plea agreement, which has
20   also been paid; both those sums being in the custody of the
21   clerk who has deposited them in the Treasury.
22        The court imposes as well a sentence of probation on each of
23   the counts.  The court directs that the probationary period run
24   for a time of three years concurrently on each count.  The court
25   directs as a special condition of probation that the defendant

1    continue to comply with each of the reforms implemented as

2    described in the presentence report and the sentencing

3    memorandum that the defendant has filed at the Aracoma mine, and

4    the court further directs that if there is any failure to

5    continue compliance with those procedures, that not only is the

6    probation officer handling this matter to be so informed within

7    thirty days, but so, too, is the president and CEO of Massey

8    Energy Company, and the defendant is to notify the probation

9    officer as well in connection with reporting those failures, if

10   any there be, that such notice has, in fact, been transmitted.

11       Let me ask the parties whether or not you have anything

12   further at this time.

13           MR. SMITH:  Your Honor, does the court need to make a

14   further order to direct the payment of the money from the

15   court's registry into the United States Treasury?

16           THE COURT:  The court will so direct.

17           MR. SMITH:  Thank you, Your Honor.  That's all the

18   United States has further.

19           THE COURT:  Very good.

20           MR. LUSKIN:  Nothing further, Your Honor.

21           MR. SMITH:  And the special assessment as well, I

22   believe.

23           THE COURT:  I understand.

24           MR. SMITH:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1         Let me ask again, anything further?

2               MR. SMITH:  No, Your Honor.

3               MR. LUSKIN:  No, sir.

4               THE COURT:  The defendant has, Mr. Luskin, as you well

5     know, ten days from this date within which to appeal its

6     conviction and sentence in this case.

7               MR. LUSKIN:  Yes, sir.

8               THE COURT:  And the court would ask again if there is

9     anything further.

10              MR. SMITH:  Your Honor, if I might raise one question.

11              THE COURT:  Go ahead.

12              MR. SMITH:  Does the court need to make a particular

13    finding regarding the absence of any need for restitution in

14    this particular criminal matter?

15              THE COURT:  I thought maybe I'd already done it, but if

16    I haven't, I do so now.

17              MR. SMITH:  Thank you.

18              THE COURT:  And that will be incorporated into the

19    order.

20              MR. SMITH:  That's all I have.

21              THE COURT:  Thank you.

22              MR. LUSKIN:  Nothing further, Your Honor.

23              THE COURT:  Again, anything further?

24              MR. LUSKIN:  No, sir.

25              MR. SMITH:  No, Your Honor.

United States v. Aracoma Coal Company                    56

1          THE COURT:  I thank you for being present.

2   Mr. Stanley, I thank you for being present as well, along with

3   Mr. Hrko who has also informed us of the position of his

4   clients, but in particular to Tonya Hatfield, I appreciate your

5   being here as well, and I especially appreciate Ms. Bragg being

6   present as well.  Thank you.

7      (At 3:57 p.m. the hearing was concluded.)

8                          --oOo--

9                   REPORTER'S CERTIFICATE

10     I, Barbara Steinke, Registered Merit Reporter, do hereby
    certify that the foregoing proceedings were reduced to writing
11  by me at the time and place therein mentioned, and said
    proceedings are a true and accurate transcript from my notes.  I
12  further certify that I am neither related to any of the parties
    by blood or marriage, nor do I have any interest in the outcome
13  of the above matter.

14

15  December 3, 2009                s/Barbara Steinke

16

17

18

19

20

21

22

23

24

25